## UNITED STATES *v.* CORTEZ ET AL.

No. 79–404.   Argued December 1, 1980—Decided January 21, 1981

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed an opinion concurring in the result, *post*, p. 422. MARSHALL, J., concurred in the judgment.

*Barbara E. Etkind* argued the cause for the United States. With her on the briefs were *Solicitor General McCree, Assistant Attorney General Heymann, Deputy Solicitor General Frey, William G. Otis,* and *John C. Winkfield.*

*S. Jeffrey Minker* argued the cause and filed a brief for respondent Cortez.

*Bernardo P. Velasco* argued the cause for respondent Hernandez-Loera. With him on the brief was *Thomas W. O'Toole.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari, 447 U. S. 904, to consider whether objective facts and circumstantial· evidence suggesting that a particular vehicle is involved in criminal activity may pro-

vide a sufficient basis to justify an investigative stop of that vehicle.

## I

Late in 1976, Border Patrol officers patrolling a sparsely populated section of southern central Arizona found human footprints in the desert. In time, other sets of similar footprints were discovered in the same area. From these sets of footprints, it was deduced that, on a number of occasions, groups of from 8 to 20 persons had walked north from the Mexican border, across 30 miles of desert and mountains, over a fairly well-defined path, to an isolated point on Highway 86, an east-west road running roughly parallel to the Mexican border.

Officers observed that one recurring shoeprint bore a distinctive and repetitive V-shaped or chevron design. Because the officers knew from recorded experience that the area through which the groups passed was heavily trafficked by aliens illegally entering the country from Mexico, they surmised that a person, to whom they gave the case-name "Chevron," was guiding aliens illegally into the United States over the path marked by the tracks to a point where they could be picked up by a vehicle.

The tracks led into or over obstacles that would have been avoided in daylight. From this, the officers deduced that "Chevron" probably led his groups across the border and to the pickup point at night. Moreover, based upon the times when they had discovered the distinctive sets of tracks, they concluded that "Chevron" generally traveled during or near weekends and on nights when the weather was clear.

Their tracking disclosed that when "Chevron's" groups came within 50 to 75 yards of Highway 86, they turned right and walked eastward, parallel to the road. Then, approximately at highway milepost 122, the tracks would turn north and disappear at the road. From this pattern, the officers concluded that the aliens very likely were picked up by a ve-

hicle—probably one approaching from the east, for after a long overland march the group was most likely to walk parallel to the highway *toward* the approaching vehicle. The officers also concluded that, after the pickup, the vehicle probably returned to the east, because it was unlikely that the group would be walking away from its ultimate destination.

On the Sunday night of January 30–31, 1977, Officers Gray and Evans, two Border Patrolmen who had been pursuing the investigation of "Chevron," were on duty in the Casa Grande area. The latest set of observed "Chevron" tracks had been made on Saturday night, January 15–16. January 30–31 was the first clear night after three days of rain. For these reasons, Gray and Evans decided there was a strong possibility that "Chevron" would lead aliens from the border to the highway that night.

The officers assumed that, if "Chevron" did conduct a group that night, he would not leave Mexico until after dark, that is, about 6 p. m. They knew from their experience that groups of this sort, traveling on foot, cover about two and a half to three miles an hour. Thus, the 30-mile journey would take from 8 to 12 hours. From this, the officers calculated that "Chevron" and his group would arrive at Highway 86 somewhere between 2 a. m. and 6 a. m. on January 31.

About 1 a. m., Gray and Evans parked their patrol car on an elevated location about 100 feet off Highway 86 at milepost 149, a point some 27 miles east of milepost 122. From their vantage point, the officers could observe the Altar Valley, an adjoining territory they had been assigned to watch that night, and they also could see vehicles passing on Highway 86. They estimated that it would take approximately one hour and a half for a vehicle to make a round trip from their vantage point to milepost 122. Working on the hypothesis that the pickup vehicle approached milepost 122 from the east and thereafter returned to its starting point, they focused upon vehicles that passed them from the east

and, after about one hour and a half, passed them returning to the east.

Because "Chevron" appeared to lead groups of between 8 and 20 aliens at a time, the officers deduced that the pickup vehicle would be one that was capable of carrying that large a group without arousing suspicion. For this reason, and because they knew that certain types of vehicles were commonly used for smuggling sizable groups of aliens, they decided to limit their attention to vans, pickup trucks, other small trucks, campers, motor homes, and similar vehicles.

Traffic on Highway 86 at milepost 149 was normal on the night of the officers' surveillance. In the 5-hour period between 1 a. m. and 6 a. m., 15 to 20 vehicles passed the officers heading west, toward milepost 122. Only two of them—both pickup trucks with camper shells—were of the kind that the officers had concluded "Chevron" would likely use if he was to carry aliens that night. One, a distinctively colored pickup truck with a camper shell, passed for the first time at 4:30 a. m. Officer Gray was able to see and record only a partial license number, "GN 88—." [1] At 6:12 a. m., almost exactly the estimated one hour and a half later, a vehicle looking like this same pickup passed them again, this time heading east.

The officers followed the pickup and were satisfied from its license plate, "GN 8804," that it was the same vehicle that had passed at 4:30 a. m. At that point, they flashed their police lights and intercepted the vehicle. Respondent Jesus Cortez was the driver and owner of the pickup; respondent Pedro Hernandez-Loera was sitting in the passenger's seat. Hernandez-Loera was wearing shoes with soles matching the distinctive "chevron" shoeprint.

The officers identified themselves and told Cortez they were conducting an immigration check. They asked if he was

---

[1] The second camper passed them 15 or 20 minutes later. As far as the record shows, it did not return.

carrying any passengers in the camper. Cortez told them he had picked up some hitchhikers, and he proceeded to open the back of the camper. In the camper, there were six illegal aliens. The officers then arrested the respondents.

Cortez and Hernandez-Loera were charged with six counts of transporting illegal aliens in violation of 8 U. S. C. § 1324 (a). By pretrial motion, they sought to suppress the evidence obtained by Officers Gray and Evans as a result of stopping their vehicle. They argued that the officers did not have adequate cause to make the investigative stop. The District Court denied the motion. A jury found the respondents guilty as charged. They were sentenced to concurrent prison terms of five years on each of six counts. In addition, Hernandez-Loera was fined $12,000.

A divided panel of the Court of Appeals for the Ninth Circuit reversed, holding that the officers lacked a sufficient basis to justify the stop of the pickup. 595 F. 2d 505 (1979). That court recognized that *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975), provides a standard governing investigative stops of the kind involved in this case, stating:

> "The quantum of cause necessary in . . . cases [like this one] was established . . . in *United States* v. *Brignoni-Ponce* . . . . '[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.'" 595 F. 2d, at 507 (quoting *United States* v. *Brignoni-Ponce, supra,* at 884) (citations omitted).

The court also recognized that "the ultimate question on appeal is whether the trial judge's finding that founded suspicion was present here was clearly erroneous." 595 F. 2d, at 507. Here, because, in the view of the facts of the two judges constituting the majority, "[t]he officers did not have a valid basis for singling out the Cortez vehicle," *id.,* at 508, and be-

cause the circumstances admitted "far too many innocent inferences to make the officers' suspicions reasonably warranted," *ibid.*, the panel concluded that the stop of Cortez' vehicle was a violation of the respondents' rights under the Fourth Amendment. In dissent, Judge Chambers was persuaded that *Brignoni-Ponce* recognized the validity of permitting an officer to assess the facts in light of his past experience.

## II

### A

The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. *Reid* v. *Georgia,* 448 U. S. 438, 440 (1980); *United States* v. *Brignoni-Ponce, supra,* at 878; *Davis* v. *Mississippi,* 394 U. S. 721 (1969); *Terry* v. *Ohio,* 392 U. S. 1, 16–19 (1968). An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.[2] *Brown* v. *Texas,* 443 U. S. 47, 51 (1979); *Delaware* v. *Prouse,* 440 U. S. 648, 661 (1979); *United States* v. *Brignoni-Ponce, supra,* at 884; *Adams* v. *Williams,* 407 U. S. 143, 146–149 (1972); *Terry* v. *Ohio, supra,* at 16–19.

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal

---

[2] Of course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.

activity. See, *e. g., Brown* v. *Texas, supra,* at 51; *United States* v. *Brignoni-Ponce, supra,* at 884.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry* v. *Ohio, supra,* said that "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*" *Id.,* at 21, n. 18 (emphasis added). See also *Brown* v. *Texas, supra,* at 51; *Delaware* v. *Prouse, supra,* at 661–663; *United States* v. *Brignoni-Ponce, supra,* at 884.

## B

This case portrays at once both the enormous difficulties of patrolling a 2,000-mile open border and the patient skills

needed by those charged with halting illegal entry into this country. It implicates all of the principles just discussed—especially the imperative of recognizing that, when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion. We see here the kind of police work often suggested by judges and scholars as examples of appropriate and reasonable means of law enforcement. Here, fact on fact and clue on clue afforded a basis for the deductions and inferences that brought the officers to focus on "Chevron."

Of critical importance, the officers knew that the area was a crossing point for illegal aliens. They knew that it was common practice for persons to lead aliens through the desert from the border to Highway 86, where they could—by prearrangement—be picked up by a vehicle. Moreover, based upon clues they had discovered in the 2-month period prior to the events at issue here, they believed that one such guide, whom they designated "Chevron," had a particular pattern of operations.

By piecing together the information at their disposal, the officers tentatively concluded that there was a reasonable likelihood that "Chevron" would attempt to lead a group of aliens on the night of Sunday, January 30–31. Someone with chevron-soled shoes had led several groups of aliens in the previous two months, yet it had been two weeks since the latest crossing. "Chevron," they deduced, was therefore due reasonably soon. "Chevron" tended to travel on clear weekend nights. Because it had rained on the Friday and Saturday nights of the weekend involved here, Sunday was the only clear night of that weekend; the officers surmised it was therefore a likely night for a trip.

Once they had focused on that night, the officers drew upon other objective facts known to them to deduce a time frame

within which "Chevron" and the aliens were likely to arrive. From what they knew of the practice of those who smuggle aliens, including what they knew of "Chevron's" previous activities, they deduced that the border crossing and journey through the desert would probably be at night. They knew the time when sunset would occur at the point of the border crossing; they knew about how long the trip would take. They were thus able to deduce that "Chevron" would likely arrive at the pickup point on Highway 86 in the time frame between 2 a. m. and 6 a. m.

From objective facts, the officers also deduced the probable point on the highway—milepost 122—at which "Chevron" would likely rendezvous with a pickup vehicle. They deduced from the direction taken by the sets of "Chevron" footprints they had earlier discovered that the pickup vehicle would approach the aliens from, and return with them to, a point east of milepost 122. They therefore staked out a position east of milepost 122 (at milepost 149) and watched for vehicles that passed them going west and then, approximately one and a half hours later, passed them again, this time going east.

From what they had observed about the previous groups guided by the person with "chevron" shoes, they deduced that "Chevron" would lead a group of 8 to 20 aliens. They therefore focused their attention on enclosed vehicles of that passenger capacity.

The analysis produced by Officers Gray and Evans can be summarized as follows: if, on the night upon which they believed "Chevron" was likely to travel, sometime between 2 a. m. and 6 a. m., a large enclosed vehicle was seen to make an east-west-east round trip to and from a deserted point (milepost 122) on a deserted road (Highway 86), the officers would stop the vehicle on the return trip. In a 4-hour period the officers observed only one vehicle meeting that description. And it is not surprising that when they stopped the

vehicle on its return trip it contained "Chevron" and several illegal aliens.[3]

## C

The limited purpose of the stop in this case was to question the occupants of the vehicle about their citizenship and immigration status and the reasons for the round trip in a short timespan in a virtually deserted area. No search of the camper or any of its occupants occurred until after respondent Cortez voluntarily opened the back door of the camper; thus, only the stop, not the search is at issue here. The intrusion upon privacy associated with this stop was limited and was "reasonably related in scope to the justification for [its] initiation," *Terry* v. *Ohio,* 392 U. S., at 29.

We have recently held that stops by the Border Patrol may be justified under circumstances less than those constituting probable cause for arrest or search. *United States* v. *Brignoni-Ponce,* 422 U. S., at 880.[4] Thus, the test is not whether Officers Gray and Evans had probable cause to conclude that the vehicle they stopped would contain "Chevron" and a group of illegal aliens. Rather the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle

---

[3] In *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 884–885 (1975), the Court listed several factors to be considered as part of the totality of the circumstances in determining the existence *vel non* of a particularized suspicion in cases treating official attempts to stem the influx of illegal aliens into our country. Though the list did not purport to be exhaustive, it is noteworthy that several of the factors present here were recognized by *Brignoni-Ponce* as significant in this context; for example, information about recent border crossings and the type of vehicle involved.

[4] The wide public interest in effective measures to prevent the entry of illegal aliens at the Mexican border has been cataloged by this Court. See, *e. g., United States* v. *Ortiz,* 422 U. S. 891, 899–914 (1975) (BURGER, C. J., concurring in judgment); *United States* v. *Brignoni-Ponce, supra,* at 878–879.

they stopped was engaged in criminal activity. On this record, they could so conclude.

*Reversed.*

JUSTICE MARSHALL concurs in the judgment.

JUSTICE STEWART, concurring in the result.

The Border Patrol officers in this case knew, or had rationally deduced, that "Chevron" had repeatedly shepherded illegal aliens up from the border; that his treks had commonly ended early in the morning around milepost 122 on Highway 86; that he usually worked on weekends; that he probably had made no trips for two weeks; and that trips were most likely when the weather was good. Knowing of this pattern, the officers could reasonably anticipate, even if they could not guarantee, the arrival of another group of aliens, led by Chevron, at milepost 122 on the first clear weekend night in late January 1977. Route 86 leads through almost uninhabited country, so little traveled in the hours of darkness that only 15 to 20 westbound vehicles passed the police during the five hours they watched that Sunday night. Only two vehicles capacious enough to carry a sizable group of illegal aliens went by. One of those two vehicles not only drove past them, but returned in the opposite direction after just enough time had elapsed for a journey to milepost 122 and back. This nocturnal round trip into "desolate desert terrain" would in any event have been puzzling. Coming when and as it did, surely the most likely explanation for it was that Chevron was again shepherding aliens.

In sum, the Border Patrol officers had discovered an abundance of "specific articulable facts" which, "together with rational inferences from [them]," entirely warranted a "suspicion that the vehicl[e] contain[ed] aliens who [might] be illegally in the country." *United States* v. *Brignoni-Ponce,*

422 U. S. 873, 884. Because the information possessed by the officers thus met the requirements established by the *Brignoni-Ponce* case for the kind of stop made here, I concur in the reversal of the judgment of the Court of Appeals.