John Lewis GLENN, Jr., Appellant,

v.

**STATE of Texas, Appellee.**

**No. B14–83–744CR.**

Court of Appeals of Texas, Houston (14th Dist.).

June 7, 1984.

Ildefonso Ochoa, Jr., Galveston, for appellant.

Miguel Martinez, Galveston, for appellee.

Before PAUL PRESSLER, ROBERTSON and ELLIS, JJ.

## OPINION

ROBERTSON, Justice.

A jury found appellant guilty of unlawfully carrying a handgun and set punishment at confinement for one year and a fine of two thousand dollars. Appellant raises four grounds of error all of which relate to the search and seizure of the handgun. We affirm.

During a hearing on appellant's motion to suppress the following facts were developed. Two plain clothes police officers were patrolling a residential area of Galveston in an unmarked police vehicle. At approximately 11:00 a.m. they observed appellant riding towards them on a bicycle. As they came abreast of each other the officers attention was directed to appellant by the manner in which he "almost fell off

the bicycle trying to get a look inside our unit." Officer Lopez, the driver, continued to watch through his rear view mirror as the appellant proceeded down the street. He became more interested in appellant as he observed appellant looking back over his shoulder at the officers and "almost falling off the bicycle again." The second officer, Roberts, told Lopez that he knew appellant "to have a record for burglary." Lopez testified "at that particular time of the year, we were having a great deal of [residential] burglaries." Becoming even more suspicious, Lopez applied his brakes to turn around and when he did, appellant "put the bicycle in high gear and turned off of Avenue R onto 34th Street and headed south on 34th Street." While the officers were attempting to catch up with appellant, he turned onto Avenue R and one-half and as he did so the officers "observed a pocket [police] scanner sticking out from underneath the bottom of his jacket ... on his right hip." Knowing that there had been a number of residential daytime burglaries in which the burglars used a bicycle and "pocket scanners to monitor police calls so they would know when the police were being dispatched", the officers decided to investigate. They pulled in front of appellant and stopped him. Officer Lopez testified that appellant appeared to be "very nervous" and "[w]e were trying to get him to keep his hands in sight. He was fidgeting, trying to get off the bicycle quickly, and it appeared to me he was trying to flee from us on foot." Lopez testified that he then placed him against the car and "for my own protection and Roberts' protection, I searched him for weapons, patted him down" and found on his left hip a Star .380 pistol, "fully loaded, cocked and locked, ready to fire." Appellant testified on the motion to suppress that he was fleeing because he thought they were a couple of "punks" rather than police officers.

█ In his first, third and fourth grounds of error appellant contends the evidence was obtained as a result of an unlawful search. We disagree. It is well established that circumstances short of probable cause for an arrest may justify temporary detention for the purpose of investigation. In *United States v. Cortez*, 449 U.S. 411, 418–419, 101 S.Ct. 690, 695–696, 66 L.Ed.2d 621 (1981), the Supreme Court aptly stated:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulate reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances— the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. (citations omitted).

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted do to the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood to those versed in the field of law enforcement. The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is

the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

■ When we apply this test to the "whole picture" as seen by the officers we believe they had a "particularized and objective basis" for temporarily detaining appellant for the purpose of investigation. Having lawfully stopped appellant for investigation, the limited "pat down" search for weapons was authorized. *Wood v. State*, 515 S.W.2d 300 (Tex.Crim.App.1974). Appellant's first, third and fourth grounds are overruled.

In his second ground appellant contends the court erred in failing to charge the jury "relating to the issue of search and seizure." Again, we disagree. Appellant did not testify before the jury and there was no disputed issue for the jury to resolve. The question was one of law for the court to determine. This ground is overruled.

The judgment is affirmed.

ELLIS, Justice, dissenting.

Finding myself in disagreement with the other members of the court, I would like to record my respectful dissent.

The following evidence was adduced at the hearing by the testifying officer regarding the officers' justification for their conduct.

A: We saw him coming toward us from 33rd Avenue and Avenue R. He was westbound. We were eastbound.

Q: Based on your experience as a police officer, would you describe that as a "high crime area"?

A: It's a residential area that, at that particular time of the year, we had been having a great deal of burglaries.

Q: And in Galveston, daytime burglaries were common?

A: At that particular time of the year we were having a rash of daytime burglaries all through the residential areas in town.

.    .    .    .    .

Q: At this point, why were you trying to catch him?

A: Due to the area we were in. The fact Officer Roberts knew he had been arrested for burglary. The fact that he had a pocket scanner on him, and at that particular time of the year, the daytime burglaries that we were having, most of the burglars were using pocket scanners to monitor police calls so they would know when the police were being dispatched, to monitor the calls.

Q: So it was your intention just to investigate?

A: Yes, sir, find out why he was fleeing from us, to find out what he was doing in the area.

According to the above testimony the testifying officer referred to the area in question as a "high crime area" because they were experiencing a "rash of daytime burglaries all through the residential areas in town." In *Talbert v. State*, 489 S.W.2d 309 (Tex.Crim.App.1973) the testifying officer said he considered the entire University of Texas area a high crime area. In rejecting the argument, the court remarked: "We are unwilling to blanket label such a substantial portion of Austin as a 'high crime area' in order to justify the stopping of appellant's automobile." In the present case, I would likewise be unwilling to label all of residential Galveston to be a high crime area as a justification for the stop in question.

The state argues that appellant's flight "is one of the strongest indication(s) of consciousness of guilt; flight tends to exclude every reasonable hypothesis except the guilty [sic] of defendant." As stated above the officers were wearing street clothes and travelling in an unmarked car. The officers never informed appellant they were police officers until after they had overtaken him. Appellant testified that he thought the two men might be punks and

that he changed his route and sped up to see if he was being followed. We cannot say that appellant's actions were necessarily consistent with criminal activity. *Shaffer v. State*, 562 S.W.2d 853 (Tex.Crim.App. 1978).

The state further argues that appellant's riding a bicycle and carrying a radio scanner fit the *modus operandi* of burglars learned of by the officers through prior burglary arrests. I do not believe this fact taken alone can justify the stop in question. The officers were not responding to a reported robbery nor do the facts indicate that appellant's actions suggested that he was about to engage in criminal activity as in *Terry v. State*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The officers testified that they observed appellant for "a minute and-a-half, two minutes at the most." I would hold the stop to be nothing more than the product of an inarticulate hunch, thus the handgun obtained as a result was inadmissible. The circumstances as a whole did not amount to probable cause to search appellant.

Accordingly, I would reverse the judgment of the trial court.