**Kent Orrin BERGE, Respondent,**

v.

**COMMISSIONER OF PUBLIC SAFETY, Appellant.**

**No. C4–84–2181.**

Court of Appeals of Minnesota.

June 25, 1985.

Wayne A. Pokorny, Excelsior, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Blake Shepard, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Heard, considered and decided by POPOVICH, C.J., and SEDGWICK and RANDALL, JJ.

**OPINION**

RANDALL, Judge.

This is an appeal by the Commissioner of Public Safety from an order of the trial court rescinding the revocation of respondent Berge's driver's license. We find that the trial court was not clearly erroneous in its finding of an unlawful stop. We affirm.

## FACTS

On August 13, 1984, Carver County Deputy Sheriff Rod Peddycoart was approaching the "Five Corners" intersection near the Norwood-Young America town line at about 3:30 a.m. Three roads converge at that intersection, and the intersection is regulated by stop signs that are set back several feet from the actual intersection.

As he was approximately one-half to three-quarters of a block away from that intersection, Peddycoart observed a vehicle drive through the intersection. When Peddycoart observed the vehicle, he estimated it to be approximately twenty feet past the controlling stop sign. Peddycoart's view of the stop sign was totally obstructed by foliage, but he knew approximately where the hidden stop sign was located. From his location, Peddycoart estimated the speed of respondent's vehicle to be 20–25 miles per hour as it drove through the intersection.

Peddycoart assumed, based on his recollection of the distance between the stop sign and the actual intersection itself, that the driver could not have gotten up to the speed he estimated the driver was doing when he first saw the car unless the driver had not made a complete stop at the hidden stop sign. Based solely on this assumption, Peddycoart followed respondent for a short distance and then activated the red lights on his squad car and stopped him. Peddycoart did testify that, in following the respondent after he had crossed the intersection, he observed him driving to the left of the center of the road, but testified that he stopped respondent solely on his assumption that respondent had failed to observe the stop sign at "Five Corners". Peddycoart testified that there is no center line on the road past the intersection where he followed respondent, and that he was not concerned with respondent's driving behavior because of that. He admitted that it was not unusual for drivers to use a significant amount of the roadway near Highway 212 where the stop occurred.

After making the stop, Officer Peddycoart testified that he noticed a strong odor of alcohol on respondent's breath, noticed that respondent's eyes were watery, slightly bloodshot, and that his speech was slightly slurred. After a few informal road tests for dexterity, Peddycoart asked respondent to take a preliminary breath test which respondent failed. Peddycoart then arrested respondent for driving under the influence and read him the Minnesota implied consent advisory form.

Respondent agreed to take the breath test and was transported to the Carver County sheriff's office for Intoxilyzer testing. More than one test was run, as the testing officer felt the first test may not have provided an adequate sample. The second sample was described as poor. The two calibrations on the two tests for a total of four different readings were all slightly different. The Intoxilyzer recorded a breath correlation percentage of 96%, and indicated a final reading of .109 which is slightly over the legal limit of .10. Respondent argues that the testing method used was not valid and the test results were not accurate.

The trial court found that the initial stop was improper, that there was no probable cause to believe that respondent was driving the motor vehicle under the influence of alcohol, and that the method used for testing respondent's alcohol concentration was not valid and reliable.

## ISSUES

1. Did the police officer have specific articulable facts and an objective basis for stopping respondent's vehicle?

2. Did the officer have probable cause to believe that respondent was driving a motor vehicle while under the influence of alcohol?

3. Was the foundation sufficient for reliability so that the Intoxilyzer results were admissible?

## ANALYSIS

The evidence in the case consists of oral testimony from Officer Peddycoart and respondent. The basic facts are not in dispute. Both parties agree that Peddycoart

did not see respondent go through a stop sign, but made the assumption that respondent had because of Peddycoart's estimated speed of 20–25 miles an hour at a point where Peddycoart estimated respondent's car to be 20 feet or more past the hidden stop sign.

It is settled that the findings of fact of a trial court are entitled to the same weight as the verdict of a jury, and with oral testimony involved the trial court alone has the opportunity to adjudge the credibility of witnesses, and thus findings of fact are not to be set aside unless clearly erroneous. *State, Department of Highway v. Beckey,* 291 Minn. 483, 192 N.W.2d 441 (1971).

■ The minimum requirements for a peace officer to make a valid investigatory stop (not amounting to a full arrest) are specific and articulable facts which have a particularized and objective basis for suspicion of criminal activity. *State v. Wellman,* 355 N.W.2d 331 (Minn.Ct.App.1984); *State v. Kvam,* 336 N.W.2d 525 (Minn. 1983); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *State v. Engholm,* 290 N.W.2d 780 (Minn. 1980).

In this case, as in *Kvam,* there are no specific findings which are preferred for proper appellate review. Our review is further hampered by ambiguity on the record resulting from the trial court's failure to set out the standard of law it applied to the stop. At one point, the court stated its reason for finding the stop unlawful:

> * * * Officer Peddycoart did not actually see the stop sign violation. He suspected there was one. He certainly could judge speed, thinking probably the fellow didn't stop, but he didn't see it. * * *

The court's statement that the officer did not see a driving violation but suspected one is consistent with lack of a particularized and specific objective basis which is the correct standard. *Wellman,* 355 N.W.2d at 332. On the other hand, in response to a question from appellant asking for clarification as to specific grounds for rescinding the revocation, the court mentioned lack of probable cause to stop and lack of probable cause to believe respondent was under the influence. For a lawful stop, probable cause is *not* the test, a particularized and articulable objective basis is.

■ Although the court did not precisely define the threshold it used in judging the evidence relative to the stop, where we have been able to infer the findings from the trial court's conclusions, we are not bound to select our option to remand. *Kvam,* 336 N.W.2d at 528. An example cited in *Kvam* is *State v. Rainey,* 303 Minn. 550, 226 N.W.2d 919 (Minn.1975): "Where there was no conflict in the evidence, the trial court's conclusions were consistent with the evidence." *Kvam,* 336 N.W.2d at 528.

We will only reverse a trial court's findings if a review of the record leaves us with the firm conviction that a mistake was made and the findings were erroneous. *Kvam,* 336 N.W.2d at 529.

■ Cases discussing the minimum threshold needed for lawful investigatory stops of automobiles show varied fact situations and modest thresholds. In *State v. Barber,* 308 Minn. 204, 241 N.W.2d 476 (Minn.1976), the court affirmed a stop by a highway patrolman who observed license plates on an automobile wired on with baling wire. The court found that the officer's visual observation of an unusual, although not illegal, method of securing license plates was enough to find the stop not the product of whim, caprice or idle curiosity. *Id.* at 477. In this case the trial court found no such minimal threshold. Although we might have found differently if reviewing the facts de novo, we cannot say the trial court's finding of an unlawful stop was clearly erroneous. Distinguishing it from *Barber,* we find that in *Barber* there was an actual objective observation of something unusual—license plates held on by wire which could indicate a stolen vehicle with different plates affixed rapidly.

In this case the State concedes there was no objective observation of respondent go-

ing through a stop sign, no speeding, nor any unlawful or unusual conduct by respondent while driving through the intersection. The officer's entire suspicion rested on an assumption that he knew from previous experience with the intersection about where the hidden stop sign was, and he estimated from one-half block or more away that, when he saw respondent's car, it was going 20–25 miles an hour. He assumed the car must not have made a complete stop in order to reach that estimated speed several feet from the approximate location of the stop sign. Thus, here the officer's stop was made, not on an objective basis, but on assumption.

There was no corroboration for the officer's estimation of speed of the car when he saw it going through the intersection. Witnesses are entitled to give an opinion as to the speed of vehicles they observe, but the weight to be given that opinion is uniquely within the discretion of the finder of fact, and can be accepted, rejected or modified based on how the factfinder views foundation and witness credibility.

Although the facts are arguably susceptible of more than one reasonable interpretation, we do not find clear error, and thus affirm the trial court's finding of an unlawful initial stop. For this finding we apply our review to the facts in light of *Wellman* and *Kvam.*

As our decision on the validity of the stop is dispositive, we do not reach the issues of probable cause to arrest after the stop was made, or the issue of the validity of the Intoxilyzer test.

### DECISION

We hold that the trial court did not err in finding an unlawful stop.

Affirmed.

SEDGWICK, J., dissents.

SEDGWICK, Judge (Dissenting)

I respectfully dissent.

### I.

In ruling the stop improper, the trial court specifically referred to the officer's lack of "probable cause to stop." As we stated in *State v. Wellman,* 355 N.W.2d 331 (Minn.Ct.App.1984), in determining the validity of an automobile stop, the test is reasonable suspicion, not probable cause. The officer "must be able to point to specific and articulable facts which, together with the reasonable inferences from those facts, reasonably warrant the invasion of a citizen's personal security. The intrusion cannot be based on an inarticulate hunch, and must be reasonable in light of the particular circumstances." *Id.* at 333 (quoting *State v. Engholm,* 290 N.W.2d 780, 783 (Minn.1980)). *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Marben v. State,* 294 N.W.2d 697, 699 (Minn.1980); *O'Neill v. Commissioner of Public Safety,* 361 N.W.2d 471 (Minn.Ct.App.1985). In *State v. Lahr,* 368 N.W.2d 6 (Minn.Ct.App.1985), this court reversed the trial court for applying the probable cause standard to determine the validity of an automobile stop.

Here, the officer observed respondent's vehicle enter the intersection at a speed of 20 to 25 miles per hour. He knew when he first saw the vehicle that it was only about 20 feet from the stop sign, although the sign itself was obstructed from the officer's view. Based on the speed of the vehicle, its distance from the sign, and the officer's training and 14 years experience it was reasonable for the officer to suspect that respondent did not stop at the stop sign. As such the officer was justified in stopping the vehicle.

### II.

In concluding that the officer lacked probable cause to believe Berge was under the influence, the trial court stated "the usual indications of being under the influence were extremely, extremely close in this case and not very strong from my hearing the testimony." Minn.Stat. §§ 169.121 and 169.123, the D.W.I. and implied consent laws, are remedial and must

be liberally construed in favor of the protection of the public. *State, Dept. of Public Safety v. Juncewski*, 308 N.W.2d 316 (Minn.1981).

In reversing a trial court's determination that the officer lacked probable cause to believe a driver was under the influence, we recently stated:

> Probable cause exists where all the facts and circumstances would warrant a cautious person to believe that the suspect was driving or operating a vehicle while under the influence. *State v. Harris*, 295 Minn. 38, 42, 202 N.W.2d 878, 881 (1972); *State v. Olson*, 342 N.W.2d 638, 640 (Minn.Ct.App.1984). Probable cause is evaluated from the point of view of a "prudent and cautious police officer on the scene at the time of the arrest." *State v. Harris*, 265 Minn. 260, 264, 121 N.W.2d 327, 331, *cert. denied*, 375 U.S. 867 [84 S.Ct. 141, 11 L.Ed.2d 94] (1963); *see Vertina v. Commissioner of Public Safety*, 356 N.W.2d 412, 413 (Minn.Ct. App.1984). In reviewing an officer's actions, the trial court should "consider the totality of the circumstances and should remember that trained law enforcement officers are permitted to make inferences and deductions that might well elude an untrained person." *State v. Kvam*, 336 N.W.2d 525, 528 (Minn.1983) (quotations omitted). Great deference should be paid to the officer's experience and judgment. *Vertina*, 356 N.W.2d at 414; *Olson*, 342 N.W.2d at 641. A determination of probable cause is a mixed question of fact and of law. *Clow v. Commissioner of Public Safety*, 362 N.W.2d 360, 363 (Minn.Ct.App.1985). "Once the facts have been found the court must apply the law to determine if probable cause exists." *Id.*

*Johnson v. Commissioner of Public Safety*, 366 N.W.2d 347, 350 (Minn.Ct.App. 1985).

Here, the officer detected a strong odor of alcohol on respondent's breath, watery and slightly bloodshot eyes, slightly slurred speech. Field sobriety tests showed respondent was unable to perform the heel-to-toe test and was only able to complete the stand-on-one-foot-and-count-to-ten test on the third attempt after two unsuccessful tries. Respondent did successfully complete the finger to nose test. A preliminary breath test registered a "fail." Given these circumstances, the officer had probable cause to believe respondent was under the influence and was justified in arresting respondent for D.W.I. and invoking the implied consent law.

## III.

The trial court also found the test results of the intoxilyzer machine invalid and unreliable. The record shows that on a first administration of the test respondent did not provide an adequate breath sample and the intoxilyzer machine indicated that the first subject test was a "deficient sample." The test operator performed a calibration standard test and began a new test. During this time respondent was under observation for 15 to 20 minutes and did not put anything in his mouth. Before testing, the intoxilyzer machine ran a series of internal diagnostic checks, showing it was functioning properly. The machine then performed four room air blank tests, showing the level of contaminants in the room at .000.

Respondent then blew into the machine. Results showed that the alcohol concentration was .112, with a replicate test (i.e., a second measure of the breath sample) of .117. The intoxilyzer machine then ran a calibration standard test on a known simulator solution of .11 alcohol concentration, and the instrument test showed results of .115 and a replicate test of .117. The intoxilyzer operator testified these readings were acceptable within B.C.A. tolerances. Respondent then blew into the intoxilyzer machine a second time, and the test results were .109 with a replicate test of .110. The intoxilyzer reported the final value by taking the lowest of the four subject readings (.109) and dropping the final decimal point, resulting in .10.

The record shows the intoxilyzer operator followed all the procedures for a valid

test. In addition, he testified he believed the instrument was in proper working order. Minn.Stat. § 169.123, subd. 2(a) (1984), provides that in tests using the intoxilyzer machine, the test consists of "one adequate breath sample analysis, one calibration standard analysis, and a second, adequate breath sample analysis." This was done here. The intoxilyzer analyzed the sample and did not indicate the sample was deficient. Minn.Stat. § 169.123, subd. 2(b) (1984). A prima facie showing that the test was trustworthy was established by the Commissioner. *State v. Dille*, 258 N.W.2d 565, 568 (Minn.1977); *Noren v. Commissioner of Public Safety*, 363 N.W.2d 315 (Minn.Ct.App.1985); *Kooi v. Commissioner of Public Safety*, 363 N.W.2d 487 (Minn.Ct.App.1985). Respondent did not challenge the validity of the second test results.

Apparently the trial court considered the test results of the first aborted test, although an inadequate breath sample was provided for that one and the test was deficient. The outcome of the first invalid test is irrelevant on whether the subsequent test was valid.

The trial court characterized the second test sample results as "different" with "variances." The two adequate breath samples supplied by respondent, each measured twice, showed readings of .109, .110, .112 and .117. The correlation percent between these readings was 96 percent, and was within established B.C.A. tolerances. The trial court erred in ruling that the test results were unreliable simply because the sample readings differed by a few thousands of a percent. The evidence shows the intoxilyzer test was administered to respondent properly and produced valid results.

The trial court erred in ruling that respondent was the subject of an invalid stop, was arrested for D.W.I. based on lack of probable cause and was the subject of an unreliable intoxilyzer test. I would reverse and remand for trial.