**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                          No. 97-4373

KENNETH PERNELL JOHNSON,
Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Frank W. Bullock, Jr., Chief District Judge.
(CR-96-123)

Argued: March 6, 1998

Decided: June 4, 1998

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge, and
CLARKE, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Carlton Ingram, Jr., FLOYD, ALLEN &
JACOBS, L.L.P., Greensboro, North Carolina, for Appellant. Sandra
Jane Hairston, Assistant United States Attorney, Greensboro, North
Carolina, for Appellee. **ON BRIEF:** Walter C. Holton, Jr., United
States Attorney, Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Kenneth Pernell Johnson entered a conditional guilty plea under Fed. R. Crim. P. 11(a)(2) and was convicted of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). Johnson reserved the right to appeal the district court's partial denial of his motion to suppress evidence. While the district court did suppress a confession made by Johnson, it held that evidence seized from the apartment of his girlfriend, Kristine Neilson, was legally obtained. To reach this conclusion, the district court ruled (1) that the police made a legal Terry stop of the automobile in which Johnson and Neilson were riding on June 12, 1996, (2) that the stop did not escalate into a full custodial arrest of Neilson, and (3) that Neilson's consent to search her car and her apartment was voluntarily given. Accordingly, the district court held that the evidence obtained in the apartment search was not "fruit of a poisonous tree" and was therefore admissible. On appeal Johnson renews his claim that the search was illegal by challenging the three rulings mentioned above. We affirm.

I.

In the morning of June 12, 1996, the Greensboro Police Department received information from the North Carolina State Police about a drug investigation involving Jason Ware. After stopping Ware's out-of-state Isuzu for speeding on Interstate 85, state troopers conducted a consensual search of the vehicle and discovered $21,000 in bundles of cash concealed in a hidden compartment. Ware told the troopers that he was returning from a visit with his uncle in Greensboro and that his uncle had given him the money for college expenses. He described the uncle as a black male with short hair and a dark complexion. Additionally, Ware gave the troopers a phone number at which he said the uncle could be reached. A subscriber check on this number revealed that the phone belonged to Kristine

2

Neilson at 3225-D Orange Street in Greensboro. This information was relayed to Detectives Graves and Austin of the Greensboro Police Department's Vice and Narcotics Division, and they proceeded to check out the address.

Detective Graves already had some familiarity with this address. Approximately six months earlier, he had received an anonymous telephone tip from a woman who alleged that narcotics were being received at 3225-D Orange Street by another woman via the mail or a delivery service. Although Graves thought that the caller might be a "jealous individual" who "had something against" the woman at the address, he nevertheless felt that the tip had "some validity" because he had arrested a man on a narcotics charge who was alleged to be the boyfriend of a woman living at this address. Consequently, Graves took a written complaint and investigated the tip. When he spoke to the manager for the apartment complex in which 3225-D was located, he discovered that Nielsen rented apartment 3225-D and that she drove a black Infiniti with New Jersey tags. Although Graves saw this vehicle during his surveillance of the apartment complex (which he conducted in fifteen to twenty minute intervals over a series of evenings), he did not see anything suspicious. Graves informed a postal inspector about the tip, but Graves had not received any response from the Postal Service. Once the state police provided him with the information from Ware on June 12, 1996, Graves realized that the address was the same one mentioned by the anonymous tipster. Moreover, from his experience as a narcotics detective, Graves knew that Ware's explanation was dubious because $21,000 (the amount of cash Ware was carrying) was the prevailing wholesale price in Greensboro for a kilogram of powder cocaine. Graves also knew that drug dealers often conceal cash in hidden compartments in their automobiles. Ware's indirect implication of 3225-D Orange Street thus had a degree of consistency with the prior tip that the apartment had some tie to the narcotics trade.

When Detectives Graves and Austin went to the apartment at this address on the morning of June 12, 1996, no one was home and the black Infiniti was gone. Graves and his partner, Detective Wallace, returned later that afternoon. Again, no one answered the door and the car was still gone. The apartment manager then verified that Neilson rented the 3225-D unit, and the manager provided the detectives with

3

Neilson's employment information. Further investigation revealed that Neilson had gone to a beauty salon to get a haircut and that she was a short, attractive black woman.

Three detectives (Graves, Wallace, and Austin) went to the salon around 3 p.m. Although they identified themselves as police officers to the employees of the salon and asked whether Kristine Neilson was there, the employees were uncooperative and slow to answer questions. When they finally did answer, some employees told the officers that they did not know who Neilson was and others said that she was not there. After the officers had been at the salon a few minutes, a woman meeting Neilson's general description emerged from a back room, walked past the officers, exited the salon, and stepped into a black Infiniti that had pulled to the curb. Detective Wallace recognized that the Infiniti matched the description of Neilson's car. Moreover, Wallace noticed that the driver (later discovered to be Johnson) was a dark-complexioned black male with short hair, who met the general description of Ware's "uncle." Wallace informed the other detectives that he believed that the woman was Neilson, and the three left the salon to follow the Infiniti.

The officers then conducted moving surveillance on the Infiniti in two unmarked police cars. The Infiniti initially appeared to be headed to Neilson's home, and a computer check of the car's New Jersey tags verified that it was registered to Kristine Neilson. Although the officers would occasionally pass the Infiniti in an effort to avoid detection, one of the police cars always stayed behind the Infiniti in order to maintain visual contact. However, after proceeding several miles the Infiniti began to slow down from its prior speed of 35 mph to a sluggish 10 to 15 mph. When the Infiniti slowed down it was in the left (fast) lane, there were no traffic lights, stop signs, or turnoffs for another 300 to 400 feet, and there was no other traffic that could have forced the car to slow to a crawl. Detective Wallace testified that despite its slow speed, the Infiniti had "nowhere to go but straight." Even though the second undercover vehicle driven by Detective Austin was already in front of the Infiniti, Detectives Graves and Wallace decided to pass the car, hoping to avoid suspicion. Both Johnson and Neilson looked at the detectives as they drove by, and once the officers had passed, Johnson made a left turn to get off the roadway. Con-

4

sidering this maneuver to be evasive, the detectives turned around, placed their blue lights on the dashboard, and stopped the Infiniti.

Detectives Graves and Wallace approached both sides of the car, told Johnson and Neilson that they were stopped because the detectives were conducting a narcotics investigation, and asked for identification. During this stop the officers were low key and courteous and did not draw their weapons. Neilson gave consent to search her car and, later, to search her apartment. After the search of her apartment (where Johnson often stayed as an overnight guest) revealed a handgun and approximately a kilogram of cocaine, Johnson was formally arrested and charged.

II.

We first address whether Detectives Graves and Wallace conducted a legal Terry stop of Johnson and Neilson. Cf. Terry v. Ohio, 392 U.S. 1 (1968). The Fourth Amendment permits limited investigative stops by law enforcement officers when they are justified"by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam). While we review de novo the ultimate question of reasonable suspicion, we review findings of historical fact only for clear error and "`give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" United States v. Sprinkle, 106 F.3d 613, 616-17 (4th Cir. 1997) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)).

We also consider the "totality of the circumstances" surrounding the stop to assess its constitutionality. See United States v. Cortez, 449 U.S. 411, 417 (1981). "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. at 417-18. As the Supreme Court has counseled, inferences and deductions made by officers do "not deal with hard certainties, but with probabilities" and the information possessed by law enforcement "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Id. at 418.

In light of these principles, we believe that the facts set forth above, when taken as a whole, justified the initial stop of the black Infiniti.

5

Therefore, we affirm the district court's determination that the officers legally stopped and questioned Johnson and Neilson based on a reasonable and articulable suspicion that they were involved in narcotics trafficking.

Turning to the remaining two issues, we believe the district court correctly ruled that Neilson's consent to search her car and apartment was voluntarily given and that the original stop did not escalate into a custodial arrest of Neilson. On these issues we affirm on the reasoning of the district court. See United States v. Johnson, No. 2:96CR123-2, mem. op at 12-15 (M.D.N.C. Apr. 29, 1997).

Accordingly, the order of the district court is

AFFIRMED.

6