JUSTICE RICE
dissenting.
¶75 I dissent from the Court’s reversal of the District Court. I disagree strongly with the Court’s conclusion that “the particularized suspicion supporting the stop in this case was based on a totality of innocent conduct” and information from “an unreliable informant.” See ¶ 62. The record and standards enunciated by this Court, including those adopted herein regarding the reliability of an informant in the context of particularized suspicion, compel the opposite result.
¶76 Although I do not dissent from the Court’s application of our informant reliability standards to stops which are premised upon particularized suspicion, the Court’s rejection of the reasoning of the United States Supreme Court in Alabama v. White (1990), 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301, is of little consequence under the facts here. The Court criticizes Alabama’s holding that “the veracity, reliability and basis of knowledge of an anonymous or otherwise unreliable informant may be inferred when police corroborate wholly innocent facts about the alleged criminal actor and no independent information indicates that the suspect is involved in an alleged crime.” See ¶ 51. However, as discussed below, the two fundamental conclusions which undergird the Court’s decision here, and its distinguishment of Alabama, those being (1) the informant was unreliable, and (2) the officers’ corroboration of the informant’s information was insufficient, are both faulty. I find the second conclusion to be profoundly so. The informant in this case was neither anonymous nor otherwise unreliable. Further, the police’s corroboration was not limited to wholly innocent facts without independent information that the defendants were involved in a crime. Thus, regardless of the necessity of corroboration, the police corroboration here was more than sufficient to support the investigative stop.
¶77 It cannot be overemphasized that this is a case involving particularized suspicion, and not probable cause. Because this was an investigative stop, our law requires only that there be “objective data from which an experienced officer can make certain inferences” and a “resulting suspicion” that criminal activity is afoot. State v. Gopher (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. The Court here is requiring much more. The conclusions of the Court are discussed in turn.
*459 RELIABILITY OF THE INFORMANT
¶78 Informant’s status. In ¶ 33, the Court repeats our long-established rule that “a citizen informant who is motivated by ‘good citizenship’ and willing to disclose the circumstances by which the incriminating information became known is presumed to be telling the truth,” but then tosses the rule away and concludes that the informant here is not entitled to a presumption of trustworthiness.
¶79 The informant meets our criteria, above-stated, for a “good citizen” informant. “[I]f the informant is motivated by ‘good citizenship’ and the information provided demonstrates a sufficient degree of the nature of the circumstances under which the incriminating information became known, then the informant’s disclosures are deemed a rehable basis____” State v. Reesman, 2000 MT 243, ¶ 34, 301 Mont. 408, ¶ 34, 10 P.3d 83, ¶ 34. The informant here was not anonymous, but identified herself, disclosed her phone and address information, revealed that she was a girlfriend to a defendant, relayed a substantial amount of information to police, and personally appeared at police offices to do so. Why did she do this? The evidence in regard to her motivation was that “she wanted to do what she thought was right.” The defense offered no alternative motivations for her conduct. Further, it was obvious from the wide range of details she provided, which were corroborated by police, that her involvement as a girlfriend to a defendant had indeed given her access to the defendants’ plans. Given this record, the Court has no basis to conclude that the informant was acting for any reason but good citizenship. As such, she should be considered reliable, yet the Court concludes that “[w]e find no factual support” for the hearing testimony that the informant was doing what she thought was right. Why does the Court deem the hearing testimony of the informant’s good motive to be without “factual support”? Because the Court does not like the informant’s background.
¶80 Instead of acknowledging that the requirements of Reesman were fulfilled here, the Court holds that the informant here cannot be considered a good citizen because she is “a convicted felon” and has “a prison history ... unclear motives [or] uncertain liability for falsely reporting.” See ¶ 64. Never have we held that informants with a criminal background could not be motivated by good citizenship, but the Court does so here. Apparently, unless the informant has a “lily white” background, she need not call, as this Court will deem her dark past to outweigh her desire to do good. The error here is painfully obvious, and cannot be denied, as the Court has given no other reason to conclude that the hearing testimony of the informant’s good motive *460 cannot be believed, and there is no other reason from the record to so conclude.
¶81 The informant’s “track record.” The Court also finds that because this was the police’s “first experience” in working with the informant, “the confidential informant had not established a track record that supports a finding of reliability,” pursuant to Reesman. In mechanically applying our informant reliability standards, the Court misses the big picture here. The absence of a “track record” is an appropriate consideration when an informant makes a first call to police about suspected criminal activity. However, that is not the situation here.
¶82 Prior to the informant’s call about the Bozeman trip which led to the stop, she made multiple other calls over a several week period about different activities, including other crimes, which were investigated by police and found to be accurate. The Court references some of the information derived from those previous calls, and the corroboration thereof.[2] Notable among those calls was the informant’s report that Olson had stolen a truck from Great Falls, which police located in the area described by the informant and confirmed had been stolen. These calls represent successful police experiences with this informant, and undermines the Court’s finding that this information suffered “indeterminable reliability.” Indeed, the reliability was established when the information was confirmed by police. Neither does the State’s failure to file charges on all of these reports serve to diminish the validity of the information provided. Quite to the contrary, each of the many calls made by the informant served to create a track record and enhance her credibility. By the time the informant informed police about the defendants’ trip to transport drugs to Bozeman, the informant was far beyond a “first experience,” and should have been considered reliable on this basis as well.
¶83 In response, the Court rejects this dissent’s reliance on the informant’s multiple accurate reports by asserting that police verification of the informant’s stolen vehicle report did nothing to enhance her trustworthiness, and by dismissing her successive reports of the defendants’ activities as “perfectly innocent conduct.” The Court fails to explain how an. accurate and corroborated report about a stolen vehicle would not serve to enhance an informant’s credibility. Further, as discussed herein, the informant’s other reports provided information that was much more than “perfectly innocent.”
*461 ¶84 The informant here provided no less than six reports to police over a several week time period which were all corroborated, and I would conclude that the last report, in response to which police initiated the stop, was based upon a successful track record.
¶85 Informant’s personal observations. The Court finds that because “the informant did not personally observe any contraband substances or drug dealing and... the record reveals nothing about the source of the informant’s knowledge, ... the court erred by finding the confidential informant’s tip to be reliable.” ¶ 57. However, this is not the proper test for assessing an informant’s personal involvement. ¶86 First, we analyze particularized suspicion in the context of “the totality of the circumstances.” State v. Reynolds (1995), 272 Mont. 46, 49, 899 P.2d 540, 542; United States v. Cortez (1981), 449 U.S. 411, 417-18, 101 S.Ct. 690, 694-95, 66 L.Ed.2d 621, 628-29. Within that context, we ascertain an informant’s personal involvement as follows:
An officer may infer that the information is based on the informant’s personal observations if the information contains sufficient detail that
“it is apparent that the informant had not been fabricating [the] report out of whole cloth ... [and] the report [is] of the sort which in common experience maybe recognized as having been obtained in a reliable way ....”
State v. Pratt (1997), 286 Mont. 156, 165, 951 P.2d 37, 42-43, quoting State v. Villegas-Varela (Or. 1994), 887 P.2d 809, 811 (quoting Spinelli v. United States (1969), 393 U.S. 410, 417-18, 89 S.Ct. 584, 589-90, 21 L.Ed.2d 637, 644). The circumstances here establish without question that the informant was not fabricating her reports from “whole cloth,” but rather, that she was in strategic proximity to the planning of the criminal activity. Therefore, we should conclude that the officer properly inferred that the substantial information provided by this informant was based upon her personal observation. The Court criticizes this dissent’s conclusion that police could infer that the informant’s reports were based upon personal observation, but it wholly fails to deal with the fact that our case law in regard to particularized suspicion allows for exactly that.
¶87 For these multiple reasons, the informant should be considered a good citizen and should be deemed to have previously provided accurate information. Corroboration should not be necessary. However, the officers nonetheless obtained it.
POLICE CORROBORATION OF THE INFORMANT’S INFORMATION
¶88 The Court improperly focuses its discussion on what the police did *462 not observe. See ¶¶ 6, 53, 55. The proper focus is what police did observe, and whether “an experienced police officer can make certain inferences” therefrom. Gopher, 193 Mont. at 194, 631 P.2d at 296.
¶89 The marijuana bud. In a conclusion which I find very troubling, the Court concludes that the bud obtained by police in the first stop of defendant Martinez bears no relevance whatsoever to the question of particularized suspicion of drug trafficking. The Court acknowledges the State’s argument that the bud was indicative of possession of a larger quantity of marijuana, but concludes that, because police “could not establish that the minuscule marijuana bud found in the vehicle belonged to Martinez and, as a result, they let him go without any charges being filed-not even the traffic charge,” the bud did not indicate “patterned criminal behavior,” and thus, cannot be considered.
¶90 Contrary to the Court’s analysis, the relevance of the bud is not limited by the failure to establish Martinez’ ownership of it, or the failure to charge him with its possession. As noted, the bud was highly relevant in confirming the informant’s report that Martinez was transporting larger quantities of marijuana in his vehicle, an inference that would be particularly significant in the eyes of “an experienced police officer,” which our analysis is supposed to consider. The failure to charge Martinez with possession of the bud is nothing more than a “red herring” issue, and the Court should not consider it. Curiously, the Court is fixated on the police’s failure to charge the defendants for violations observed prior to the stop at issue here. That the police elected not to further investigate or charge the defendants with theft of the truck or with possession of the bud could very well have reflected police interest in furthering their investigation of the reported transport of a large amount of drugs, but, whatever the reason, takes nothing away from the significance of this evidence in relationship to particularized suspicion. This one small piece of evidence, with its large attendant meaning in regard to drug trafficking, should require a different result here.
¶91 The Court attempts to dismiss the seizure of the marijuana bud because “the investigating officers did not put any significance on their discovery.” The Court ignores that the officers testified that the bud appeared to come from a stem, and that it was not ground up marijuana, but, in any event, that testimony apparently does not satisfy the Court. The Court will not be deterred, suppressing this evidence because “[n]o officer testified at the suppression hearing that the bud was ‘highly relevant.’”
¶92 In so holding, the Court misses the point of the entire case. This case was about stopping a suspected drug trafficker who was reported *463 to be transporting a large amount of marijuana. Yet, because the officers didn’t specifically testify that “we think this marijuana bud came from a bigger pile of marijuana,” the Court finds that the bud offers no significance as objective data for purposes of particularized suspicion. This conclusion is nothing more than extreme hair splitting and is irreconcilable with the requirement that we analyze particularized suspicion in the context of the “totality of the circumstances.” Reynolds, 272 Mont. at 49, 899 P.2d at 542; Cortez, 449 U.S. at 417-18, 101 S.Ct. at 694-95, 66 L.Ed.2d at 628-29.
¶93 Switching of vehicles/future plans. The Court overlooks critical facts in its analysis of the informant’s reliability, the police’s corroboration efforts, and ultimately, the determination of particularized suspicion: the conspirators’ switching of vehicles, and the predictive nature of the defendants’ plans. Following the police stop and the discovery of the bud in the Chevrolet pickup driven by Martinez on November 3, the informant told police that the defendants were leaving Billings the next day, and that because of the police stop, they had switched vehicles and were going to drive a teal-colored Mazda truck with a temporary sticker. The switch in vehicles was confirmed by independent police surveillance. About this information, the State offers in its brief:
The reliability of the information and its use as the basis for the detectives’ particularized suspicion is buttressed not only by the detail she provided, but also relating things that were going to occur, including Martinez’s arrival in Billings on November 2, his switching to a different truck after the November 3 stop, and his and Olson’s driving together in the teal truck toward Bozeman on November 4. [Emphasis in original.]
Despite the significance of this information, which was not lost to experienced police officers, the Court concludes that this is “perfectly innocent conduct” which added nothing to the police’s investigation and decision to stop the vehicle. See ¶ 68. The Court apparently believes that it is “perfectly innocent” for a visitor to Billings to change vehicles for his return trip after he is stopped by police and dispossessed of the illegal drugs in his car. This activity may appear to be “perfectly innocent” to judges in Helena, but it is anything but innocent to trained police officers on the street, and it is the officers’ viewpoint through which we are to assess the information. Gopher, 193 Mont. at 194, 631 P.2d at 296. Further, this Court has previously acknowledged that such “innocent” travel information is highly relevant, and can form the basis of confirming an informant’s report, as well as a subsequent stop or arrest. See State v. Griggs, 2001 MT *464 211, ¶ 43, 306 Mont. 366, ¶ 43, 34 P.3d 101, ¶ 43. The Court should so conclude here.
¶94 In his presentation at oral argument, Attorney General Mike McGrath offered these comments:
The officers involved in this case did what we told them to do when we do training. They’ve done what this court asked them to do .... They did not make a stop until they determined that they had a particularized suspicion to do that.... I mean, they did this right. They spent time developing the corroboration that this court requires them to do. And I think if you look at all the facts, you say that the police officers in this case did what we asked them to do. They did the right thing and I don’t think they should be penalized. Clearly, Judge Fagg made the right decision.
In stark contrast to the Attorney General’s assertion that the police “did this right” by collecting the necessary evidence to justify the stop, the Court concludes that the police had no legitimate evidence at all. The Court has deftly pruned, snipped and trimmed all the pieces of the police’s investigation so that nothing remains of their work except “innocent conduct” and “untrustworthy information.” The Court has abandoned the totality of the circumstances test for a narrow and rigid application of standards which bears no resemblance to practical reality. While I do not minimize the Attorney General’s concern that we not penalize the officers, the larger problem is that this decision will eventually penalize all citizens by diminishing the officers’ ability to protect their public safety.
¶95 I dissent.

 In its discussion in these referenced paragraphs, the Court overlooked other critical information provided by the informant, which is discussed below.