**UNITED STATES of America, Plaintiff,**

v.

**Barry Lee PITCHFORD and Charles Thomas Walraven, Defendants.**

**No. CR88–034–K.**

United States District Court,
D. Wyoming.

Oct. 14, 1988.

Lisa E. Leschuck, Asst. U.S. Atty., D. Wyo., Cheyenne, Wyo., for plaintiff.

George W. Borges, San Francisco, Cal., and Glenn A. Duncan, Laramie, Wyo., for defendant Pitchford.

Kenneth M. Mogill, Detroit, Mich. and Wallace Stock, Cheyenne, Wyo., for defendant Walraven.

## ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come on regularly for hearing before the Court on defendants' motion to suppress; plaintiff appearing by and through its attorney, Lisa E. Leschuck, Assistant United States Attorney for the District of Wyoming; defendant Pitchford appearing by and through his attorneys, George W. Borges and Glenn A. Duncan; and defendant Walraven appearing by and through his attorneys, Kenneth M. Mogill and Wallace L. Stock; and the Court having heard the arguments of counsel, the testimony of the witnesses, and having fully and carefully reviewed and considered the motion and all matters pertinent thereto, and being fully advised in the premises, FINDS:

The evidence which defendants seek to have suppressed, namely approximately two kilos of cocaine along with a roach clip and some marijuana, was seized following a traffic stop. According to the Government, the chain of events which led to the seizure at issue did not place in jeopardy defendants' Fourth Amendment protections. Defendants contend that the initial stop was unreasonable and unlawful, meriting suppression of all evidence seized as the fruits of the illegal detention. Not only, say defendants, were their Fourth Amendment rights violated but also their fundamental right to unfettered interstate travel guaranteed by the Privileges and Immunities Clause was needlessly interfered with through a policy of holding "out-of-staters under closer scrutiny," Tr. at 22, by calling in out-of-state plates for purposes of verification. Before addressing the merits of the various claims, the Court sets forth the pertinent facts.

While on patrol on the morning of March 26, 1988, Deputy Robert Debree of the Albany County Sheriff's Department observed two men in a 1983 brown Cadillac Fleetwood Sedan bearing Tennessee license plates pass his patrol car on Interstate 80 east (I–80) near the Grand Avenue entrance for the freeway, east of Laramie, Wyoming. Debree decided to run a license check through the FBI's National Crime Information Center (NCIC) computer network, a practice resorted to to determine if a vehicle might be wanted or stolen, and a registration check. The NCIC check came back negative.

A problem surfaced with the registration check however. The license plate number Debree transmitted to the dispatcher was CYR 490. When the dispatcher repeated the plate number back to Debree for confirmation, the number she relayed was CYR 409. According to his testimony at the suppression hearing, Debree did not recollect hearing the dispatcher because he was concentrating on the subject vehicle. Tr. at 48. As the transcript of the radio communications (R.Tr.) at the time shows, the dispatcher was to relay the incorrect plate number two more times over a three and a half minute period without correction from Debree. R.Tr. at 1, 2. See also Tr. at 48. Consequently, the plate number the dispatcher ran turned out to belong to a 1988 grey Toyota belonging to a woman in Tennessee.

At that time, Debree was approximately six car lengths ahead of the Cadillac and pulled off to the emergency lane, waiting for it to pass. When the Cadillac went by,

DeBree activated his overhead emergency lights in pursuit. He called for backup, stating that the two men were acting "kinda' suspicious." R.Tr. at 1. Seeing that the car was not responding to his emergency lights, Debree gave two blasts of his siren. After traveling approximately a mile and a half to two miles from the point Debree's emergency lights were activated, the Cadillac finally came to a stop.

Debree walked to the driver's side and informed the driver, defendant Pitchford, that he was pulled over due to the registration information he received showing the plate number as belonging to a Toyota. The officer determined that the vehicle's other occupant, defendant Walraven, was the actual owner of the Cadillac and asked to see their driver's licenses and car registration, whereupon they produced the same.

A subsequent NCIC check of the two individuals revealed that neither had outstanding arrest warrants. The piece of paper representing the registration puzzled Debree because the words "Application for Registration" appeared on it, and the type of vehicle and description were handwritten in the blanks rather than typewritten as the officer had been accustomed to. Debree proceeded to call in the license plate number one more time. Again the dispatcher repeated back CYR 409. This time, however, Debree corrected her with the end result being that the plate number correctly belonged to the subject Cadillac.

Within a few minutes after Debree's call for assistance, Sergeant Lance Robinson of the Sheriff's Department arrived. Before Robinson's arrival, Debree had communicated to him that the occupants of the car somewhat matched a "drug courier" profile and that it was his intention to wait for Robinson before asking the individuals for permission to search the trunk. R.Tr. at 3. With Robinson there, Debree reapproached the driver's side of the Cadillac to return the driver's licenses and registration. He asked the defendants if they were carrying any illegal narcotics or firearms to which both replied in the negative.

Debree then asked them if it was all right if he searched the vehicle. According to the officer's testimony, defendant Pitchford consented and almost immediately, in response to Debree's request to search the trunk first, defendant Walraven consented as well, reaching into the glove compartment to activate the trunk release. Tr. at 51. Pitchford got out of the car and raised the trunk lid the rest of the way, whereupon he stood by Robinson on the rear right-hand side of the vehicle while Debree commenced his search.

In addition to some suitcases, Debree spotted a blue nylon satchel in the upper left-hand corner of the trunk. After unzipping the satchel, he found several crumpled grocery sacks which he moved to the side, exposing two large packages wrapped with silver-colored duct tape. Based upon his drug training, Debree correctly concluded that each package contained a kilo of cocaine.

Debree radioed for more help after Pitchford denied knowledge of the contents of the packages. He drew his weapon and ordered Walraven out of the car. Both men were arrested on suspicion of narcotics trafficking and, with the arrival of more officers, were transported to the Albany County Sheriff's Office where they were Mirandized. A subsequent search of Walraven produced a small roach clip and smoke-colored glass vial containing a white powdery substance. A search of the car pursuant to a warrant was later conducted and a brown suitcase containing cocaine and marijuana was found.

Defendants contend that the initial stop was unlawful since they had committed no traffic offense to speak of and were not wanted for any crimes. Rather, they maintain, the law enforcement officer's decision to seek verification of their license plate solely because it was out-of-state as well as his subsequent stop of their vehicle based on a mistaken communication represented a constitutionally impermissible interference with their right to freely travel and be placed on an equal footing with Wyoming citizens.

If defendants are correct in their position on the initial stop, then the conclusion which would logically flow, and one which defendants espouse, is that any fruits of the search which followed this stop are inadmissible as evidence against them due to the initial taint. If, however, the initial stop is untainted and lawful, attention must then turn on whether, given the totality of the circumstances, one of the generally accepted exceptions to the warrant requirement is present to shelter the evidence from a suppression challenge.

The decision in *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 139, 1401, 59 L.Ed.2d 660 (1979), firmly entrenched in the law a standard which requires that before a law enforcement officer can stop an automobile and detain its driver in order to check a driver's license or verify the registration, the officer must have "articulable and reasonable suspicion" that the stop will reveal the existence of a license or registration problem or that the occupants and/or the car are wanted in connection with a crime. A stop and detention wherein this standard is lacking raises Fourth Amendment concerns. The *Prouse* standard, while somewhat elusive of definition, requires a review of what Chief Justice Burger termed as the "whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). In the words of the Chief Justice:

> Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity....

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, ..., and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same— and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

> The second element ... is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* at 417–418, 101 S.Ct. at 695 (citations omitted).

[1] As the scenario described above unfolded, Deputy Debree pieced together information, including the result of the registration check, albeit mistaken, together with his objective observations of the appearance of defendants' vehicle and defendants' mannerisms, ranging from their determination to avoid eye contact with the officer to their somewhat heightened uneasiness in his presence, which in his mind triggered a belief that defendants matched a "drug courier" profile for the transportation of illegal drugs. Tr. at 48–49, 50, 109–111, 122–123, and 141. His belief was reinforced when defendants failed to pull their vehicle over in response to his flashing lights until they had been pursued for over a mile. Notwithstanding the officer's failure to detect the dispatcher's error on three separate occasions within a three and a half minute period, he unquestionably acted in good faith upon the report when he pulled defendants' vehicle over to investigate the perceived registration discrepancy. Given the officer's nearly seven years of law enforcement experience involving over 1,000 traffic stops, taken together with his additional training in narcotics trafficking and packaging, Tr. at 36–40 and 54, there existed in his mind a belief which would alert a reasonable person that some

sort of crime had been or was in the process of being committed. *See Bledsoe v. Garcia,* 742 F.2d 1237, 1240 (10th Cir.1984). Accordingly, the Court finds that the initial stop was lawful.

■ It is unnecessary to make much more than a passing remark about defendants' arguments premised upon the Privileges and Immunities Clause of Art. IV, § 2. In view of the manner in which the license plate checks are conducted, the extent of any intrusion upon the traveling public, while a subject more appropriately left to a spirited debate in the classrooms of our law schools, hardly rises to an impermissible interference with the fundamental right to travel from state to state.

■ Before turning to evidence seized, the Court briefly addresses defendants' argument relative to the period of time they were detained on I–80. Defendants urge that even if the initial stop is viewed as lawful, there existed no legal basis for their continued detention once the registration mix-up was corrected. At the time of the stop, Deputy Debree was the only law enforcement officer on the scene. In light of the officer's observations, he could reasonably have perceived a threat to his own well-being. Detaining defendants for some 80 seconds until assistance arrived cannot be assailed as unreasonable when placed in the balance. Such minimal intrusion of an individual's Fourth Amendment rights is outweighed by society's strong interest in protecting the lives of law enforcement officers engaged in the performance of what many times can be life-threatening work. *See United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).

Turning to the search which followed, defendants argue that the evidence seized must be suppressed because they claim no consent was obtained for such search but rather it was the product of a police show of authority which communicated to them that they would not be free to leave. The Government contends that when the totality of the circumstances are examined, the conclusion that consent was freely and voluntarily given is inescapable. Of course, the theory behind suppression is that the Government should not be permitted to profit from evidence it obtains in disregard of the Constitution. *See Silverthorne Lumber Co., Inc. v. United States,* 251 U.S. 385, 391–392, 40 S.Ct. 182, 182–183, 64 L.Ed. 319 (1920).

By now, it is talismanic that a warrantless search without probable cause is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted). Equally settled is that one of the exceptions to the warrant and probable cause requirements is a search conducted on the basis of consent freely and voluntarily given. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580–2581, 45 L.Ed. 2d 607 (1975). Voluntariness is gleaned from a determination of all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed. 2d 854 (1973).

In applying the consent exception, the Tenth Circuit has fashioned a three-pronged test which must be passed before consent will be found to have been voluntary: "(1) there must be clear and positive testimony that consent was unequivocable and specific and freely given; (2) the government must prove consent was given without duress or coercion; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights." *United States v. Guglielmo,* 834 F.2d 866, 868 (10th Cir.1987).

■ Application of the *Guglielmo* standard to the facts of this case convinces the Court that the search conducted by Deputy Debree was done pursuant to consent which was indeed "unequivocable and specific and freely given." *Id.* The facts show that after defendants' driver's licenses and registration were returned, the officer inquired of them whether they were carrying any illegal narcotics or firearms. Defendant Walraven shook his head in a manner indicating they were not; defendant Pitchford looked out the windshield and

replied, "no." Tr. at 50. According to the officer, he then asked defendants if they would mind if he searched the vehicle, to which Pitchford replied, "I don't know why you would want to, but I imagine you can go ahead." Tr. at 51. Walraven, the owner of the car, replied, "Sure, go ahead." *Id.* When the officer asked if he could search the trunk first, Walraven responded affirmatively, pressing the trunk release button. *Id.* Pitchford then got out of the vehicle and raised the trunk lid the rest of the way, standing behind Debree and next to Officer Robinson while the search of the trunk was taking place. Tr. at 52. At no time during the search of the trunk did Pitchford retract his consent. Tr. at 152. Such failure to limit the breadth of one's consent is indicative that there was continual consent. *See United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986).

In support of his position, defendant Walraven argues that it would have been ludicrous for him to grant consent since it was he who had placed the cocaine in the trunk. Tr. at 196 and 201–202. Given Walraven's prior criminal history, it would not be so unfathomable to give consent to search on the off chance that the officer might overlook some indicia of criminal activity.

Despite counsel for defendant Pitchford's attempts to portray the scene of the stop as reminiscent of the prejudice visited upon "a black down south in the '50's …," Tr. at 29, and Deputy Debree's sunglasses as "the big down south sheriff shape …," Tr. at 93, the Court finds no indication that what began as an investigative detention somehow mushroomed into a scenario where constitutional rights went by the wayside. Nothing before the Court shows that either defendant's will had been overborne and that his capacity for self-determination had been critically impaired as these terms were developed in an entire body of case law. In fact, Walraven testified he knew his rights well in spite of not being informed of them and yet he facilitated the trunk search by pressing the release button. Tr. at 206.

Precisely viewing the totality of the circumstances, the Court holds that the initial investigatory stop and subsequent search were proper and lawful, in no way compromising rights guaranteed defendants under the Fourth Amendment.

NOW, THEREFORE, IT IS

ORDERED that defendants' motion to suppress be, and the same is, hereby denied.