STATE OF NEBRASKA, APPELLEE, V.
CRISTOBAL M. LONGA, APPELLANT.
318 N.W.2d 733

Filed April 23, 1982. No. 44343.

I. Mark Bledstein and Leslie Ellen Shear of Bledstein & Lauber, for appellant.

Paul L. Douglas, Attorney General, and Bernard L. Packett, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

The defendant, Cristobal M. Longa, was charged by information with knowingly or intentionally possessing cocaine with the intent to distribute, deliver, or dispense said controlled substance. Defendant's motions to suppress certain evidence seized following his arrest were overruled after a hearing on the motions. According to a jury verdict filed on April 17, 1981, the defendant was found guilty by the District Court for Douglas County and was sentenced to a term of not less than 3 nor more than 5 years in the Nebraska Penal and Correctional Complex. He has appealed from that conviction and sentence, contending specifically that certain evidence seized was inadmissible as the fruits of an arrest made without probable cause; that the warrants for the seizure of evidence were not based on probable cause; and that the trial court erred in limiting testimony at the suppression hearing to evidence appearing on the face of the warrants. We affirm.

At some time prior to September 3, 1980, members of the Omaha Police Department received information from a confidential source concerning certain drug-related activities in the city of Omaha. This

informant told police that he had seen cocaine packaged for street sale in a residence house located at 422 North 34th Street in Omaha. Furthermore, he stated that he also had been inside the residence of one Ned Reynolds at 4057 Frederick Street and had observed cocaine packaged for street sale there as well. Finally, the informant told police that Ned Reynolds was involved in the sale of narcotics, and that on the evening of September 3 or 4, 1980, Mr. Reynolds would leave his residence at 4057 Frederick Street to make a purchase of cocaine. Another source informed the police at a later point that while someone would be leaving the Frederick Street residence to purchase cocaine, that person would not be Mr. Reynolds.

On the basis of this information, the police obtained search warrants for both residences during the afternoon of September 3, 1980. Surveillance was also established at the Frederick Street residence in the late afternoon of September 3, 1980, by members of the vice and narcotics unit.

At approximately 6:30 p.m., on September 3, 1980, officers observed a person, who was later identified as James Sorensen, leave the Frederick Street residence and drive away in a yellow Mustang. This car was followed to a duplex on Jackson Street where Sorensen was observed entering the residence at 3524 Jackson Street. Approximately 25 minutes later Sorensen was seen leaving the Jackson Street residence carrying a black soft object or objects, described by one officer as "packets of some sort." From here Sorensen was followed to the 422 North 34th Street address and eventually returned to the Frederick Street residence.

Prior to Sorensen's arrival at the Jackson Street address the police were completely unaware of any suspicious activity at this residence. Upon Sorensen's arrival at that address, one officer noted the presence of a 1977 Cadillac parked in the vicinity of

the duplex. While Sorensen was inside the Jackson Street duplex, a second car approached the residence and an occupant thereof went inside the residence for a short time. This vehicle was followed as it left the residence and was eventually stopped. Its occupants, however, were not held for any reason connected with the present case.

Following Sorensen's departure from Jackson Street, Officer McKillip was left at the address to continue with the surveillance. At approximately 7:30 p.m., 10 to 15 minutes after Sorensen had left, this officer noticed four people emerge from the residence, stand on the lawn and talk for a few minutes, and then walk off in separate directions. Two of these individuals, one of whom was identified as the appellant herein, walked toward the aforementioned Cadillac. The officer observed appellant remove what appeared to be a pillowcase from the passenger side of the Cadillac and dump its contents into the trunk of the car. Appellant's companion, Oswald Gonzalez, was observed crossing the street carrying an object under his shirt. Upon reaching the car, Gonzalez entered the driver's side and was seen removing what appeared to be a black shaving case from under his shirt and placing it on the front seat. The officer termed the companion's activities "strange" and stated that it made her pay "particular attention to what they [Longa and his companion] were doing." Appellant then got into the passenger seat of the Cadillac and Gonzalez got behind the wheel and drove away.

At this point the officer conducting the surveillance was picked up by a second officer, Sergeant O'Donnell, in order to follow the Cadillac. Officer McKillip advised Sergeant O'Donnell that the occupants of the Cadillac had acted "strange" and that she felt the car should be stopped for further investigation. The Cadillac was followed until it stopped at a convenience store at the intersection of 33rd and

Cass Streets. At this point the officers pulled up behind the Cadillac, approached the car, and identified themselves as police officers. While there is some dispute over whether appellant was in the car or standing outside of it at this point, such a conflict does not appear material or relevant to this case. Upon identifying himself as an officer, Sergeant O'Donnell asked the occupants of the Cadillac whether they possessed any drugs or money, to which appellant's companion responded that they did not have any drugs but did have over $1,000 in cash with them. At or near this time, third and fourth officers arrived. Longa and his companion, Gonzalez, were handcuffed and placed in a squad car, and the Cadillac was impounded.

Shortly after Longa's arrest the police served the search warrants at 422 North 34th Street and 4057 Frederick Street. These searches resulted in the seizure of substances, suspected to be cocaine, from each address and the detention of six or seven persons at the Frederick Street residence. Based upon these seizures and arrests, plus activities of those persons under surveillance, warrants were issued for the search of the 1977 Cadillac as well as the residence at 3524 Jackson Street. The search of the Jackson Street residence took place at about 10:30 p.m. on September 3, 1980, and resulted in the seizure of substances suspected to be cocaine, a large amount of money, and the arrest of one Scott Rosenkrantz. The Cadillac, which was registered in Gonzalez' name, was searched at about 10:45 p.m. that same evening, and resulted in the seizure of a black bank bag containing over $8,000 and numerous items of identification of one Oswald Gonzalez. A search of the car's trunk revealed numerous items of clothing scattered about the trunk on hangers. No controlled substances were found in the Cadillac.

The absence of any controlled substances in the Cadillac, as well as the absence of any "toilet arti-

cles,'' aroused the interest of the police in discovering where Longa was staying while in Omaha. By questioning Mr. Rosenkrantz it was discovered that Longa may have been staying at the New Tower Motel, and preparation for a warrant application for that location was commenced. An attempt to locate appellant's room at the New Tower proved unsuccessful, and gave rise to an investigation of local motels in an attempt to find the one at which Longa was staying. This investigation resulted in the discovery that appellant was staying at the Thrifty Scot Motel, and consequently the affidavit for the warrant was altered, at the direction of one of the investigating officers, by the insertion of ''Thrifty Scot'' wherever ''New Tower'' appeared. It should be noted that affidavits setting forth all the facts concerning the activities of September 3, 1980, as set out above, were also attached to the request for the warrant to search the motel room.

On the strength of these affidavits, a warrant was issued to search room 407 at the Thrifty Scot Motel. The search resulted in the seizure of certain notebooks and papers; $3,800 in cash; a suitcase containing a suspected controlled substance, a scale, and other assorted items; and certain other amounts of a suspected controlled substance from various other areas of the room. The substances seized from the motel room were later analyzed by a chemist who confirmed that the substances were cocaine of varying quality. These findings resulted in the filing of the aforementioned information against appellant and his subsequent conviction.

Longa's first assignment of error concerns the admissibility of the items seized from the Cadillac, the Jackson Street residence, and the Thrifty Scot Motel room. He contends that the officers did not have probable cause to stop the Cadillac at 33rd and Cass Streets, and that, therefore, all evidence seized thereafter is inadmissible as the fruits of an illegal arrest.

The resolution of this issue requires that we first address the question as to when the arrest actually occurred. As recently noted by the U.S. Supreme Court: "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *United States v. Mendenhall,* 446 U.S. 544, 553-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).

On at least one occasion in the past we have determined that one who is stopped by an officer during a rainstorm and asked to come down to the sheriff's office to talk was not under arrest until he reached the sheriff's office and was observed trying to conceal a knife as he got out of the car. This was in spite of the fact that another officer accompanied the person as a passenger in the car as the person drove his automobile to the sheriff's office. *State v. Irwin,* 191 Neb. 169, 214 N.W.2d 595 (1974).

In light of *Irwin* and the standards for arrest articulated by the U.S. Supreme Court, we cannot conclude that appellant was arrested at any point prior to the time he was handcuffed and placed in the police squad car. The actions of Officers McKillip and O'Donnell in stopping their car behind the Cadil-

lac, approaching appellant and his companion with guns holstered and identifying themselves as officers, and then inquiring whether appellant or his companion possessed either a controlled substance or a large amount of cash were not tantamount to an arrest and therefore did not mandate that the officers possess "probable cause" at this time.

Neb. Rev. Stat. § 29-829 (Reissue 1979) permits officers to make stops short of an arrest in order to determine the name and address of the person stopped, and receive an explanation of that person's actions. While such "investigative stops" are governed by the fourth amendment as well, it is clear that "in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975).

The rationale behind requiring something less than probable cause for such stops is readily applicable to the present case. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams,* 407 U.S. 143, 145-46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). See, *State v. Jefferson,* 196 Neb. 340, 242 N.W.2d 881 (1976); *State v. Micek,* 193 Neb. 379, 227 N.W.2d 409 (1975).

This lesser standard for investigative stops was recently articulated by this court in *State v. Ebberson,* 209 Neb. 41, 305 N.W.2d 904 (1981), and reiterated in *State v. Nowicki,* 209 Neb. 640, 309 N.W.2d 89 (1981). Therein, relying on *United States v. Cortez,* 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), we determined that " 'an investigatory stop must be justified by objective manifestation that the person stopped is, has been, or is about to be engaged in criminal activity. In determining what cause is sufficient to authorize police to stop a person, the totality of the circumstances — the whole picture — must be taken into account.

" 'Police officers must have a particularized and objective basis for suspecting the person stopped of criminal activity. The assessment of the totality of circumstances includes all of the objective observations and considerations, *as well as the suspicion drawn by a trained and experienced police officer by inference and deduction that the individual stopped is or has been or is about to be engaged in criminal behavior.* See, *Brown v. Texas,* 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *Delaware v. Prouse,* 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).' " (Emphasis in original.) 209 Neb. at 645, 309 N.W.2d at 92-93.

It must be noted that this lesser standard is applicable only to "reasonable" seizures that fall short of an arrest. "The reasonableness of seizures that are less intrusive than a traditional arrest [citations omitted] depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Brown v. Texas,* 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979).

It is readily apparent when one applies the facts of the present case to these standards that the officers in question took reasonable action on the basis of particularized and objective facts. A view of the to-

tality of the circumstances reveals that Longa was present at a house prior to and during a visit to said house by one James Sorensen. The police had observed Sorensen previously leaving a house from which they suspected someone was to leave to make a drug purchase on September 3, 1980. Police also observed this same James Sorensen leave the house where appellant was located, carrying two soft packets of something. Furthermore, appellant and a companion were seen leaving this house 10 to 15 minutes after Sorensen, and the companion was carrying an object under his shirt in a "strange" manner. This activity caused one officer to conclude that appellant and his companion should be investigated further. Finally, the police had been made aware of the fact that the drug supplied for the suspected sale was from out of state and possibly was connected to Las Vegas, Nevada. This knowledge served to increase suspicion when appellant and his companion entered a car bearing California license plates.

On the basis of these facts we conclude that the activities of the officers prior to the actual arrest of appellant were based upon a suspicion of criminal activity falling within the fourth amendment guidelines set forth above. Therefore, such action was permissible under § 29-829.

We move next to Longa's contention that the arrests of himself and Gonzalez were illegal and all evidence seized was the "fruit of the poisonous tree." Although we believe that the arrests in this instance may very well have been justified under the ruling in *United States v. Vasquez,* 638 F.2d 507 (2nd Cir. 1980), it is not necessary for us to make that determination. The only evidence which the record discloses that the officers obtained from Longa or Gonzalez was the fact that they possessed no drugs, but did have over $1,000 in cash. This information was furnished by Gonzalez *prior* to the ar-

rest as a result of a legitimate investigatory stop.

As we recently noted in *State v. Smith,* 207 Neb. 263, 268-69, 298 N.W.2d 162, 166 (1980): "In *Brown v. Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), the U.S. Supreme Court made it clear that the mere fact that there is an illegal arrest does not thereby cause all evidence otherwise lawfully obtained to be inadmissible 'per se.' Further, in the case of *Costello v. United States,* 365 U.S. 265, 280, 81 S. Ct. 534, 5 L. Ed. 2d 551 (1961), the U.S. Supreme Court made it clear that, '[T]he "fruit of the poisonous tree" doctrine excludes evidence obtained from or as a consequence of lawless official acts, not evidence obtained from an "independent source." ' " Was the evidence being challenged by appellant, to wit, the evidence seized from the Cadillac, the Jackson Street residence, and the Thrifty Scot Motel room, "fruit of the poisonous tree," or was it obtained from an untainted "independent source"? The test to be applied is whether " 'the evidence to which instant objection is made has been come at by exploitation of that illegality [the illegal arrest] or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

Upon applying this test to the facts of the present case, it is our conclusion that the evidence seized from the Cadillac, the Jackson Street residence, and the Thrifty Scot Motel room was not discovered as a result of an "exploitation" of the arrest claimed to have been illegal, but resulted instead from independent sources. Appellant's first assignment of error is without merit.

Turning to appellant's second assignment of error challenging the existence of probable cause for the issuance of the search warrants for the Cadillac, the Jackson Street duplex, and the Thrifty Scot Motel

room, we have serious doubts as to his standing to challenge the search of either the Cadillac or the Jackson Street duplex. However, because the three searches were so intertwined from a factual standpoint, we will ignore the standing issue for the purposes of this opinion.

We note that "[t]he rule is well established that, in evaluating the showing of probable cause necessary to support a search warrant, only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. *Spinelli v. United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *State v. Bazis,* 190 Neb. 586, 210 N.W.2d 919 (1973). It is also well established that affidavits for search warrants must be tested and interpreted in a commonsense and realistic fashion; and that where the circumstances are detailed, where reasons for crediting the source of information is given, and when the magistrate has found probable cause to exist, the court should not invalidate the warrant by interpreting the affidavit in a hyper-technical manner. *State v. Payne,* 201 Neb. 665, 271 N.W.2d 350 (1978)." *State v. Stickelman,* 207 Neb. 429, 433, 299 N.W.2d 520, 523 (1980). Furthermore, we have held that "probable cause is to be evaluated by the collective information of the police as reflected in the affidavit, and is not limited to the firsthand knowledge of the officer who executes the affidavit." *Id.* at 433, 299 N.W.2d at 524.

The affidavits for the warrants to search the Cadillac and the Jackson Street residence were also attached to the application for the warrant for the Thrifty Scot Motel room. Therefore, the information provided to the magistrate in support of the issuance of warrants for each location included the fact that an informant had provided information regarding a drug purchase that was to originate at 4057 Frederick Street on September 3 or 4, 1980; that officers had observed James Sorensen drive from

the Frederick Street address to a duplex at 3524 Jackson Street and leave that address carrying a packet containing a soft substance; that appellant and a companion were observed leaving the Jackson Street address shortly after Sorensen had left, and the companion was carrying an object under his shirt; that appellant and his companion had admitted prior to their arrest that they were carrying over $1,000 in cash; and that a search of the Frederick Street residence following Sorensen's return to that address resulted in the seizure of multiple ounces of a suspected controlled substance. An additional affidavit attached to this application contained information regarding the basis of the informant's information and his credibility. On the basis of this information, we conclude that probable cause did indeed exist for the issuance of the warrants for the Jackson Street duplex and for the Cadillac.

The existence of probable cause for the issuance of the warrant to search the room at the Thrifty Scot Motel additionally relates to the so-called ''defective'' affidavit. Although somewhat redundant, we believe that it is necessary to discuss this affidavit in more detail. The affidavit was signed by Officer Jack Caniglia. As originally drawn, it states: ''When Scott ROSENKRANTZ was questioned by Sgt. O'DONNELL concerning the two Cubans GONZALEZ and LONGA, Scott ROSENKRANTZ stated that while these two persons were in town they were staying at the NEW TOWER MOTEL, 7101 Grover St . . . .'' However, Lieutenant Olson, who was supervising the preparation of the affidavit, testified that he sent Sergeant O'Donnell and Officers Wills and Gorgen out to check things out with the desk clerk. Sometime thereafter, Sergeant O'Donnell reported back the fact that the two suspects had checked out of the New Tower Motel that morning. Lieutenant Olson then ordered his officers to check other motels in

the area to see if they could be located. Sometime around midnight, Lieutenant Olson received a call from Officer Gorgen that he had "located them at The Thrifty Scott." Olson then instructed the typist to go through the affidavit and wherever the affidavit said "New Tower" to insert "Thrifty Scot." Also, he dictated an additional paragraph which read "Officer GROGEN [sic] checked the motel and found that a LONGA & GONZALEZ are registered there and there is a note in their box, Room 407."

We have noted in the past that "an affidavit is sufficient if it will support the issuance of a warrant after any inaccurate statements in the affidavit are disregarded." *State v. Green,* 201 Neb. 828, 832, 272 N.W.2d 764, 767 (1978). When this is done to the present affidavit, although all reference to the location of Longa and Gonzalez being at the Thrifty Scot Motel as related by Rosenkrantz would be deleted, the affidavit still contains the statement that "Officer GROGEN [sic] checked the motel [Thrifty Scot] and found that a LONGA & GONZALEZ are registered there . . . ." Considering that all the facts set forth above in relation to the Jackson Street and Cadillac warrants were also contained in affidavits attached to the application for the Thrifty Scot warrant, in spite of the misstatement of fact contained in the one affidavit, we conclude that the warrant was properly issued for a search of the Thrifty Scot Motel room. Appellant's second assignment of error is without merit.

This brings us to appellant's third and final assignment of error. That assignment is as follows: "The trial court erred in limiting testimony to information appearing on the face of the warrants, since all information known to the police was relevant to the constitutionality of Appellant's arrest." His proposition of law in support of this assignment reads: "The requirement that probable cause be challenged only from the face of the search warrant affidavit

does not apply where the defendant seeks to suppress evidence as the fruit of an arrest made without probable cause." That Longa is truly concerned only with the warrantless arrest and not the search warrants is evident by reference to counsels' comments to the trial court at the suppression hearing. Gonzalez' attorney stated: "I believe that it is very relevant to this arrest, not to the affidavits, but to this arrest, whether the information received by the officer came from a reliable informant. We are ruling here on the warrant. The ruling has to be upon whether this Court feels that the officers acted within the law by relying upon the information given to them by this informant." Immediately thereafter, Longa's attorney said: "There is no affidavit or warrant for the arrest of these guys, Judge. . . . I agree that what Jack O'Donnell [the arresting officer] knew is certainly important. . . . [B]ut I think it was quite clear . . . that here is the man, Lieutenant Olson, that is feeding him a lot of the information, not personally gathering information, but he is kind of the axle in the thing giving out the information." Additionally, in the argument portion of his brief, Longa states: "But there was also an issue as to the validity of the warrantless arrests of Longa and Gonzales [sic]. With respect to that issue, the defense was entitled to inquire fully into the state of mind of the officers."

Even assuming that the trial court was in error in limiting appellant's examination as to the reliability of the informant, Longa's attack in this regard goes only to the question of whether there was sufficient probable cause to arrest appellant and, consequently, whether evidence seized subsequent to the arrest was inadmissible as fruit of an illegal arrest. In light of our determination that the evidence seized was not connected with appellant's arrest, a challenge of probable cause for the arrest is immaterial

and any error by the trial court in that area would be harmless error.

"It is a longstanding rule of this court that it will not reverse a criminal conviction in the absence of prejudice to the defendant." *State v. Brehmer, ante* p. 29, 38, 317 N.W.2d 885, 891 (1982). Therefore, we may disregard the third assignment of error.

There is no prejudicial error in this record, and the judgment of the District Court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., concurs in the result.