STATE OF NEBRASKA, APPELLEE, V. VINCENT EUGENE KAVANAUGH, APPELLANT.

434 N.W.2d 36

Filed January 13, 1989. No. 87-1125.

Robert G. Scoville, of Ryan & Scoville, for appellant.

Robert M. Spire, Attorney General, and David Edward Cygan for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

After a trial to the court, the defendant, Vincent Eugene Kavanaugh, was found guilty of driving while under the influence of alcoholic liquor and refusing to submit to a breath test under the implied consent law. The defendant was sentenced to 6 months' probation and fined $250 on each count, and his driving privileges were suspended for 60 days. Upon appeal to the district court, the judgment was affirmed.

The defendant has now appealed to this court and contends that his arrest was the result of an illegal stop and that the evidence obtained as a result of the illegal stop should have been suppressed.

The defendant operates a mobile home business, which is located approximately a block and a half west of the intersection of U.S. Highway 77 and old U.S. Highway 20 in South Sioux City, Nebraska. On April 23, 1987, at about 1:20 a.m., Deputy Sheriff Randall Walsh, who was on patrol, stopped at that intersection for a traffic light. While he was stopped, Walsh saw a pickup truck with a camper top drive out of the mobile home business and turn west on old Highway 20. It was a foggy night, and Walsh would not have been able to see the pickup truck except for its headlights. Walsh turned west on old Highway 20 and stopped the pickup truck about three-fourths of a mile west of the defendant's place of business.

After the pickup truck had been stopped, Walsh recognized the defendant as the driver. When the defendant rolled down the window on the driver's side, Walsh noticed the odor of alcohol, and the defendant admitted he had been drinking. The defendant's eyes appeared red and watery. Walsh asked the defendant to perform several field sobriety tests, which he failed. The defendant was also unsteady on his feet.

Walsh arrested the defendant and took him to the Dakota County sheriff's office. At the sheriff's office the defendant was asked to submit to a breath test, which he refused.

The issue on this appeal is whether the investigatory stop of

the defendant's vehicle was lawful. At the trial the defendant moved to suppress the testimony relating to the evidence gained as a result of the stop of his vehicle, as a violation of his fourth amendment rights under the U.S. Constitution and of his rights under article I, § 7, of the Nebraska Constitution. That motion was overruled.

A police officer may in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior even though there is no probable cause to make an arrest. *State v. Brewer*, 190 Neb. 667, 212 N.W.2d 90 (1973).

In *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), the U.S. Supreme Court held:

> The Fourth Amendment applies to seizures of the person, including brief investigatory stops . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. . . .
>
> . . . .
>
> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

As we said in *State v. Longa*, 211 Neb. 356, 363-64, 318 N.W.2d 733, 738-39 (1982),

The rationale behind requiring something less than probable cause for such stops is readily applicable to the present case. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). See, *State v. Jefferson*, 196 Neb. 340, 242 N.W.2d 881 (1976); *State v. Micek*, 193 Neb. 379, 227 N.W.2d 409 (1975).

This lesser standard for investigative stops was recently articulated by this court in *State v. Ebberson*, 209 Neb. 41, 305 N.W.2d 904 (1981), and reiterated in *State v. Nowicki*, 209 Neb. 640, 309 N.W.2d 89 (1981). Therein, relying on *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), we determined that " 'an investigatory stop must be justified by objective manifestation that the person stopped is, has been, or is about to be engaged in criminal activity. In determining what cause is sufficient to authorize police to stop a person, the totality of the circumstances — the whole picture — must be taken into account.

" 'Police officers must have a particularized and objective basis for suspecting the person stopped of

criminal activity. The assessment of the totality of circumstances includes all of the objective observations and considerations, *as well as the suspicion drawn by a trained and experienced police officer by inference and deduction that the individual stopped is or has been or is about to be engaged in criminal behavior. . . .'* "

See, also, *State v. Thomte*, 226 Neb. 659, 413 N.W.2d 916 (1987); *State v. Pierce and Wells*, 215 Neb. 512, 340 N.W.2d 122 (1983); *State v. Ebberson*, 209 Neb. 41, 305 N.W.2d 904 (1981).

In this case, Walsh explained that he stopped the defendant's vehicle because he suspected that a burglary might have taken place at the defendant's business. Businesses located along old Highway 20 had experienced burglaries and vandalism. Those facts, together with the lateness of the hour and the fact that Walsh did not recognize the truck as belonging to the defendant, caused him to believe that criminal activity might have taken place and that it was his duty to stop the truck and find out what its driver had been doing at the defendant's place of business more than an hour after midnight.

At the hearing on the motion to dismiss, Deputy Sheriff Walsh testified,

Q- Okay. Have you had prior contact with this defendant?

A- Not on a personal basis.

Q- Did you know him?

A- I didn't [sic] him at the time, who it was, no.

Q- Okay. Are you familiar with the location of his business where he sells mobile homes?

A- Yes, I am.

Q- Do you go by there very often?

A- As much as possible.

Q- Okay. While on duty?

A- Yes, that's one of our areas in the county that we have a problem with.

Q- Okay. Do you — are you familiar with the business hours?

A- I've very seldom saw [sic] people in there after — like — 6 - 6:30 at night.

Q- Okay. Are you familiar with the other businesses in

the area?

A- Yes, I am.

. . . .

Q- What types of activity?

A- Well, we have several complaints on suspicious vehicles in the area of the Diamond Horseshoe which is right adjacent to Mr. Kavanaughs. We have several alarms and burglary complaints of the junk yards in that area, mainly Garvins and stuff like that and Knights of Columbus, we have several complaints on file in that general area of suspicious activities, vehicles people called us on. Burglaries to residences and businesses.

Q- All within a fairly close proximity to Mr. Kavanaugh's business?

A- Within about a mile — mile and a half area right there, yeah.

Q- Within the county, that would be a close proximity, wouldn't it?

A- Yes, that's our junk yard area. It goes out there on Old Highway 20.

Q- And on the day in question, the 23rd of April, you had that knowledge at the time you were on patrol?

A- Yes, I did.

Q- You contacted the defendant, for what purpose?

A- As I said, I was at the intersection. I saw a vehicle pull out. It was real foggy out. It was dark. I had no idea who the vehicle belonged to.

Q- Okay, what time was it that you contacted him?

A- About 1:20 in the morning.

. . . .

Q- Okay. Had you observed any late night activity at the Kavanaugh — the business before?

A- No, I hadn't.

Q- Ever seen lights on?

A- No I do not.

Q- Ever see any people there?

A- No.

Q- Any vehicles?

A- Just vehicles that are parked there all the time. That's

it.

Q- Okay. You mentioned the fog, did that create any significant factor, as far as your considerations in this matter?

A- As I said, I was sitting at the intersection. If the vehicle pulling out of the business would not have had it's [sic] lights on, I probably wouldn't have even noticed.

Q- Okay. Was that fog have any- — okay, you stopped him for what purpose?

A- Because the vehicle was coming out of a business at 1:20 in the morning.

Q- And what did that mean to you?

A- That suspicious — suspicious activity may have possibly meant that a burglary had just occurred there.

Q- And did you think — what facts did you rely on to say that a burglary may possibly have just occurred?

A- My past experiences of knowing when most of your burglaries occur and the suspicious activity and burglaries we've had in that general area.

Q- Fog have any significance?

A- Yes, it did.

Q- What?

A- Visibility was approximately — his driveway is maybe a block to a block and a half from that intersection and on nights when it's dark and foggy, it offers concealment for criminal activity.

Q- Time have any significance?

A- Yes.

Q- What?

A- At 1:20 in the morning, most businesses are closed.

Q- So after making this observation, what did you do next?

A- I turned and went westbound on Old Highway 20 following the vehicle and stopped it. I also called South Sioux Police Department to have their officers come out to the area because there was another vehicle that was getting ready to exit the — the business. It was a panel truck type deal.

Q- What business is that?

A- Kavanaugh's Mobile Homes.

At the trial, Deputy Walsh testified,

Q- Okay. Approximately what time was this?

A- About 1:22 in the morning.

Q- And you observed a vehicle leave Mr. Kavanaugh's business?

A- Yes, I did.

Q- Were you familiar with that vehicle?

A- No, I wasn't.

Q- Did these items cause any thoughts to come across your mind?

A- Well, I'm norm- — Sheriff's Office has had an increase in burglaries. Residential and business, vandalism. That is one of the areas of the County that we've had problems with the Truck Stop and the junk yard dealerships down the road and so as I was there, I made a left. I decided I better check it out and find out if there was a burglary going on or what.

He further testified,

A- I explained to him that I observed his vehicle leave the parking lot and that I was not aware of who it was.

Q- That was why you stopped him?

A- Yes, sir.

Q- Now, you say that there was no other reason for stopping him?

A- Other than my knowledge of past burglaries and vandalisms we've had in that area - - -

Q- Had Kavanaugh ever called in and had a burglary?

A- Not to my knowledge he hasn't.

Q- How many incidents of burglaries were there in that neighborhood?

A- We've had several of 'em within - - -

Q- How many?

A- - - - I would estimate 15 to 20 — 10 to 20.

Q- In what area?

A- We've had vandalisms at the truck stop right to the west and at Garvin's Salvage down the road has had several burglaries where items have been taken. Trio's has been broke into several times down the road. We've got

several burglaries out there.

Q- Those are places that are two miles to the west, aren't they?

A- That whole stretch is where we've had problems, yes. The old highway.

Q- But Trio and Garvin are two miles west?

A- No Garvin's is between Mr. Kavanaugh's business and where I stopped him, probably a quarter to a half mile down the road.

Q- Garvin's is a quarter to a half mile down the road from Kavanaugh's?

A- No, G & R Salvage (indiscernible) G & R Salvage. Garvin is down the road from Trio's.

Q-But Garvin is the one that reported the break in?

A- No, G & R Salvage.

Q- Oh, now it's — now it's G & R Salvage?

A- Yes, it is, sir.

Q- Are you sure who reported the breakins, officer?

A- Yes, I am. I do have copies of various complaints if you'd like to see them.

In 3 W. LaFave, Search and Seizure, a Treatise on the Fourth Amendment, § 9.3(c) at 440 (2d ed. 1987), the author comments,

Especially during the hours of darkness, the police will have a sufficient basis to stop in order to investigate whether a burglary of a closed commercial establishment is pending or had occurred when the suspect is seen in such close proximity to that establishment that he appears to be something other than a mere passerby. Sometimes the time of day and nature of the area will be very significant in establishing the requisite proximity, and thus where a car pulled away from a tavern located in an industrial area at about 5 o'clock in the morning, it was proper to stop the vehicle, as the tavern had been closed for several hours and there would be no valid reason for persons to be stopping in this industrial area during this time.

In this case, the evidence as to the totality of the circumstances was such that the trial court could conclude that the investigatory stop of the defendant's vehicle by Deputy

Walsh was justified. It is difficult to imagine what legitimate reason a stranger would have entering the defendant's premises at 1:20 a.m. on a foggy night when visibility was poor.

As the New Jersey Supreme Court stated in *State v. Davis*, 104 N.J. 490, 504, 517 A.2d 859, 866-67 (1986),

> "[P]olice officers are trained in the prevention and detection of crime. Events which would go unnoticed by a layman ofttimes serve as an indication to the trained eye that something amiss might be taking place or is about to take place. The police would be derelict in their duties if they did not investigate such events."

See, also, *State v. Fillion*, 474 A.2d 187 (Me. 1984); *People v Bloyd*, 416 Mich. 538, 331 N.W.2d 447 (1982); *Leaper v. State*, 753 P.2d 914 (Okla. Crim. 1988); *State v. Fox*, 58 N.C. App. 692, 294 S.E.2d 410 (1982); *People v. Ellis*, 113 Ill. App. 3d 314, 446 N.E.2d 1282 (1983); *People v. Allen*, 50 Cal. App. 3d 896, 123 Cal. Rptr. 80 (1975).

The judgment is affirmed.

AFFIRMED.

WHITE, J., dissenting.

" '[A]n investigatory stop must be justified by objective manifestation that the person stopped is, has been, or is about to be engaged in criminal activity. . . .' " *State v. Nowicki*, 209 Neb. 640, 645, 309 N.W.2d 89, 92 (1981).

In this case, Kavanaugh was leaving his mobile home business at 1:20 a.m., driving a pickup with a camper. He stated that he often worked late at his place of business. The officer testified that he saw Kavanaugh pull out of the parking lot but did not recognize the truck through the fog. He then followed the defendant for approximately 2 minutes and, after observing no aberrant driving behavior, stopped the defendant.

The officer stated that his reason for the stop was that the vehicle was coming out of a business at 1:20 in the morning. No thefts or burglaries or any incidents of vandalism had been reported by Kavanaugh that day. The officer testified that there was "suspicious activity"; there had been some vandalism and other criminal activity within 1 or 2 miles of the defendant's business. There is no testimony as to the exact nature of the criminal activity nor as to how near in time the activity had

occurred.

These observations and suspicions do not establish an "objective manifestation" that criminal activity has been, or will be, engaged in. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The U.S. Supreme Court has held that this protection applies not only to citizens in their homes, but also to citizens driving on the public roads. See *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 58 L. Ed. 2d 660 (1979). In this case, that constitutional safeguard has been abridged. Both the stop and the subsequent arrest were illegal.

Therefore, any evidence arising from the unlawful conduct of the officer, including his observations of the defendant's apparent intoxication, should have been suppressed.

SHANAHAN, J., joins in this dissent.