STATE OF NEBRASKA, APPELLEE, V. RODNEY J. PILLARD,
APPELLANT.
456 N.W.2d 755

Filed June 22, 1990.    No. 89-1156.

Dennis R. Keefe, Lancaster County Public Defender, and Craig L. Nelson for appellant.

Robert M. Spire, Attorney General, and Donald E. Hyde for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

WHITE, J.
Defendant, Rodney J. Pillard, appeals from an order of the

district court for Lancaster County affirming the defendant's conviction in the Lancaster County Court of driving while intoxicated, third offense (count I), and driving during suspension (count II). On count I defendant was sentenced to 6 months' imprisonment, a 15-year suspension of his driver's license, and a $500 fine; on count II defendant was sentenced to 3 months' imprisonment, a 1-year suspension of his driver's license, and a $500 fine, the sentences to be served concurrently.

The defendant assigns as error the county court's orders (1) overruling defendant's motion to suppress evidence, (2) entering a judgment of conviction when there was insufficient evidence on both counts to support a finding of guilty, and (3) imposing an excessive sentence on both counts. We affirm.

The evidence presented at the hearing on defendant's motion to suppress shows that Deputy Emanuel Bartek of the Lancaster County sheriff's office went to Merle's Tavern in Emerald, Nebraska, at approximately 3:45 p.m. on August 23, 1988, in order to conduct a followup investigation on a matter unrelated to this case. While there, Deputy Bartek noticed that there were only two customers in the bar, and he did not at first recognize either of them. One of the customers, Earl Jennings, initiated a conversation by asking if Deputy Bartek remembered him. At this point Bartek recalled that Jennings was the owner of Earl's Steak House in Denton. Jennings proceeded to tell Deputy Bartek that his license was suspended and, pointing at the customer seated next to him, said, "Pillard here is driving for me." At that point Deputy Bartek recalled that Jennings had a long history of driving while intoxicated arrests and that his driver's license was currently suspended.

Deputy Bartek testified that he had never met Pillard or seen him before this time. However, he stated that he did recognize the name Pillard through information shared among the sheriff's office, the State Patrol, and the Lincoln Police Department.

Having concluded his conversation with Jennings, Bartek resumed speaking with the bar employees. During this conversation, he noticed that Pillard left the bar area and went toward a hallway in the tavern where the restroom and the exit were located. Bartek concluded his investigation and left the

building. He did not see Pillard and became concerned that Pillard may have left in his own vehicle and that Jennings would drive on suspension. Deputy Bartek then reentered the tavern to look for Pillard, but did not see him. Bartek went back outside and looked around the building, but he still saw no sign of Pillard.

Deputy Bartek noted that there was only one vehicle parked in the lot, a blue Yugo sedan. He became concerned that Jennings did not actually have someone to drive him home. Bartek ran a radio check on the license plate of the Yugo and found it to be registered to a Jennings family in Denton, Nebraska. He also ran a check on Jennings and confirmed that his license was suspended for driving while intoxicated. A check on the name Pillard revealed no wants or warrants for anyone by that surname.

Deputy Bartek then drove his cruiser to the top of a hill west of Emerald at approximately 91st and West O Streets, where he could observe the tavern's parking lot should Jennings attempt to drive. Bartek remained there for a short time, until approximately 4:15 p.m., when he decided to terminate this surveillance because his shift was ending at 4:30. He saw no one attempt to drive the Yugo while he observed the parking lot.

Still thinking that Jennings might not have a driver, Bartek radioed Deputy Gordon Harrod, who was the deputy that would be patrolling the district, and informed Harrod of his concerns and observations regarding Jennings and the blue Yugo. Bartek then ended his tour of duty and drove to the sheriff's department garage in Lincoln.

Shortly after their radio conversation, Deputy Harrod was passing through Emerald en route to another call and observed two people in the bar parking lot standing near the blue Yugo which had been described to him by Deputy Bartek. Harrod pulled into the parking lot of a nearby business to observe whether the people would leave in the car. They did so, proceeding westbound on U.S. Highway 6 (West O Street) for about a block, and then turning south onto Southwest 84th Street, which goes into Denton. Deputy Harrod followed them for approximately 1 mile and contacted Deputy Bartek for a description of the person who he thought would attempt to

drive during suspension. Bartek gave Harrod a description of Jennings, and Harrod stated that Jennings appeared to be a passenger in the vehicle at that time. Harrod then informed Bartek that he saw no violations or erratic driving and that he was going to discontinue following the vehicle.

During or immediately following the aforesaid conversation, the Yugo pulled into a residential driveway just south of Southwest 84th and West A Streets. Harrod also informed Bartek of this occurrence and described the residence to him. Bartek told Harrod that he was familiar with the residence and the people who lived there and that he was of the opinion that Pillard and Jennings would have no business being there. Bartek then directed Harrod to continue following the vehicle. Harrod also testified that this aroused his suspicion because in his opinion Pillard was trying to avoid him.

Deputy Harrod then testified that he continued driving south for about a mile and pulled off to the side of the road "to see if there was a possibility that these people may have been just trying to lose me." After approximately 1 minute, the blue Yugo drove by, resuming its southbound course on Southwest 84th Street. Harrod continued following the vehicle for another mile when it again pulled off the road into another residential driveway, and Deputy Harrod continued down the road a short distance, and then backed his cruiser into a road which went into a cornfield on the west side of Southwest 84th Street. The Yugo again, after a minute or two, drove by headed south.

Harrod relayed this information and a description of the residence to Deputy Bartek, who responded as he did previously—that he was familiar with the residence and the person who lived there and that Pillard and Jennings had no business being there. Bartek then directed Harrod to stop the vehicle and "see what is going on."

Deputy Harrod stopped the blue Yugo in front of Earl's Steak House in Denton and subsequently arrested the defendant for driving during suspension and driving while intoxicated. Deputy Harrod testified that during the time he was following the Yugo from West O Street until he turned on his red lights to stop the vehicle, his cruiser was within sight in the Yugo's rearview mirror.

The test to determine whether an investigative stop is justified is whether the police officer has a reasonable suspicion based on articulable facts which indicate that a crime has occurred, is occurring, or is about to occur and that the suspect may be involved. *State v. Rein,* 234 Neb. 917, 453 N.W.2d 114 (1990); *State v. Carter,* 232 Neb. 666, 441 N.W.2d 640 (1989). In determining what cause is sufficient to authorize police to stop a person, the totality of the circumstances must be taken into account. *State v. Rein, supra*; *State v. Nowicki,* 209 Neb. 640, 309 N.W.2d 89 (1981). Police officers must have a particularized and objective basis for suspecting the person stopped of criminal activity. The assessment of the totality of the circumstances includes all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction that the individual stopped is, has been, or is about to be engaged in criminal behavior. *United States v. Cortez,* 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State v. Kavanaugh,* 230 Neb. 889, 434 N.W.2d 36 (1989). See, also, *State v. Thomte,* 226 Neb. 659, 413 N.W.2d 916 (1987); *State v. Ebberson,* 209 Neb. 41, 305 N.W.2d 904 (1981).

In this case, the totality of the circumstances includes the observations, knowledge, and inferences drawn by both Deputy Harrod and Deputy Bartek. It is stated in *U.S. v. De Leon-Reyna,* 898 F.2d 486, 488 (5th Cir. 1990): "The determination of 'reasonable suspicion' involves the consideration of the totality of the circumstances, including the collective knowledge of all the officers in assessing the facts. *E.g., United States v. Shaw,* 701 F.2d 367, 377 n. 4 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984)."

Deputy Bartek testified that the first driveway that the Yugo pulled into was known to him to belong to a residence on several acres of land owned by a Mr. Lewis. There were several large steel buildings on the property, and Bartek knew that Lewis raised championship Clydesdale horses. Bartek stated that he had had calls there for service in the past, reports of theft and loss, and also business checks. Bartek also testified that

Mr. Lewis has asked me to watch his residence as part of

our neighborhood watch program, that he is retired. He's gone oftentimes in promotional business with his horses. And he's asked us to do business checks on his property for any activity that is generated on there without his presence being there.

Deputy Harrod testified that Bartek told him that it was his (Bartek's) understanding that Pillard and Lewis were not on friendly terms and that he could not think of any reason why the Yugo would be pulling in there.

The second residence was known by Bartek to belong to Steve Skillman, a county employee whom Bartek had known for 13½ years. Bartek testified that he had been to the property before, that Skillman at one time ran a business on his property, and that Skillman kept "[h]igh quality body shop and mechanics tools of a professional use" on the property. Skillman had also spoken to Bartek concerning the neighborhood watch program. Since Skillman had terminated his business at his residence and now worked a day job (8 a.m. to 4:30 p.m.), he was concerned that people would still go to that residence thinking it was a business and when they found it to be vacant, he would subsequently suffer losses of his tools and equipment. Bartek also testified that Jennings and Pillard would not have any business stopping at the Skillman residence.

Bartek testified that these actions by the Yugo and its occupants caused him concern over the occurrence of criminal activity.

The totality of the circumstances provides a sufficient basis to justify Deputy Harrod's investigatory stop of the Yugo. As we have said, a police officer may in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior even though there is no probable cause to make an arrest. *State v. Kavanaugh, supra; State v. Brewer,* 190 Neb. 667, 212 N.W.2d 90 (1973). In this case, the circumstances and manner of the stop were appropriate.

Pillard's next assignment of error, that there was insufficient evidence to sustain a conviction on both counts, is not addressed because Pillard fails to discuss the issue in his brief.

Assignments of error not discussed are not considered by this court. *State v. Rowland,* 234 Neb. 846, 452 N.W.2d 758 (1990); *State v. Martin,* 232 Neb. 385, 440 N.W.2d 676 (1989); *In re Interest of P.M.C.,* 231 Neb. 701, 437 N.W.2d 786 (1989).

Pillard's final assigned error is that the sentences are excessive, and he argues in his brief that probation should have been imposed. An order denying probation and imposing a sentence within the statutorily prescribed limits will not be disturbed on appeal unless there has been an abuse of discretion. *State v. Shepherd, ante* p. 426, 455 N.W.2d 566 (1990); *State v. Johnson,* 234 Neb. 110, 449 N.W.2d 232 (1989). For driving while intoxicated, third offense, a $500 fine and a 15-year license revocation are mandatory. See, Neb. Rev. Stat. §§ 28-106 (Reissue 1989) and 39-669.07 (Reissue 1988). Six months' imprisonment is the maximum sentence for count I. The sentence imposed for count II, a Class III misdemeanor, is the maximum authorized by statute. The court ordered that the sentences be served concurrently.

The sentences are within the statutorily prescribed limits, and, in view of the defendant's record, the trial court did not abuse its discretion in imposing such sentences. The judgment is affirmed.

AFFIRMED.

FAHRNBRUCH, J., not participating.