A04A0791. SOLIS v. THE STATE.
(602 SE2d 166)

BARNES, Judge.

A jury convicted Sebastian Solis of trafficking by possessing more than 400 grams of a mixture that was at least ten percent cocaine and possession of cocaine with intent to distribute. The trial court merged the possession count with the trafficking count and sentenced Solis to serve 27 years in custody. Solis appeals the conviction, contending that the trial court erred in (1) denying his motion to suppress; (2) denying his motion for a directed verdict; (3) admitting evidence of business cards from the Texas Department of Corrections; (4) charging the jury regarding inferences that follow when someone leases a house; and (5) submitting a verdict form on which the option to find

him guilty preceded the option to find him not guilty. For the reasons that follow, we affirm the conviction.

1. Solis contends that the trial court erred in denying his motion to suppress, arguing that he was detained and arrested without probable cause, and therefore the results of a subsequent search warrant were the fruit of a poisonous tree. The State contends it had probable cause to stop and then arrest Solis, and that the searches of the house and car were proper.

> When we review a trial court's decision on a motion to suppress, the evidence is construed most favorably to uphold the findings and judgment of the trial court; the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous and will not be disturbed if there is any evidence to support them. [Cits.]

(Punctuation omitted.) *Bayshore v. State*, 258 Ga. App. 65 (573 SE2d 97) (2002).

(a) The events leading up to Solis's arrest in May 2003 began in November 2002. An agent with the U. S. Drug Enforcement Agency testified at Solis's motion to suppress hearing that in November 2002, he was on loan from the DEA to U. S. Customs, investigating drug trafficking in the Northern District of Georgia. Customs has a tip line for people to give anonymous information about drug smuggling, and received a call that someone was going to bring four or five kilograms of cocaine from Texas to Atlanta. The tipster said that the man would be driving a Ford Focus with a Texas license plate, that his route would take him through Gadsden, Alabama, and he would be staying at a specific hotel in the Lavista Road area. He also said that the man traveled regularly from Texas to Atlanta, several times each month.

The agent spoke with the manager of that specific hotel and asked if someone by the name the tipster had provided had checked in. The manager said no, so the agent asked if the hotel had a regular guest traveling from Texas who stayed there "every month or week." The manager described Solis, who was using the name Hernandez, and Solis's car, a Focus with Texas plates, which the agent located in the parking lot. The agent set up surveillance on the car, and after four hours Solis left his hotel room, put an object into the trunk of a Dodge Sebring with Alabama tags, and drove away. Solis returned in about an hour, took something from the trunk, and went into his hotel room. Two hours later, Solis came out, moved the Sebring next to the Focus, and began taking the dash out of the Focus. The agents then approached Solis and found $150,000 cash but no drugs. They seized

the money and released Solis after interviewing him. The agents discovered several days later that Solis was on parole in Texas on a drug trafficking case.

In May 2003, a Customs agent contacted the DEA agent, who was no longer on loan to Customs, and said that Customs had received another tip about Solis. The same tipster said Solis was again en route to Atlanta in a Ford Focus with a Texas tag to make a transaction involving four or five kilos of cocaine somewhere in the area of Lavista Road. The Customs agent then spotted Solis on Lavista Road and followed him to a house in Stone Mountain. Solis backed the car into the garage, got out, and went inside. Shortly afterward, a man drove up in a truck, went into the house, and then drove away with Solis in the truck. The driver dropped Solis off at a gas station, from which he walked to a car rental place next door and rented a Lincoln.

The agents began following Solis, who drove to Buford Highway in Chamblee. At some point Solis apparently became aware that he was being followed, because he began driving "at a pretty high rate of speed" through a residential area, making "weird turns" without signaling, and generally driving erratically. He eventually pulled into a strip mall, almost hitting another car in the process, and parked several businesses away from a restaurant, which he then entered.

The agents followed Solis into the restaurant, identified themselves, and asked him to step outside. In response to their questions about where was he coming from, Solis said he had just come from the airport. At that point a detective with the DeKalb County police arrived and took control of the interview, asking Solis twice for his driver's license. Solis did not respond, but backed away and began pacing, shuffling, and looking around. Based on his mannerisms and movements, the detective patted Solis down for his safety, and felt a hard object in his back pocket. Solis explained it was his wallet, and when the officer asked him a third time if he had a driver's license, Solis produced a Texas license. While the detective was comparing the license photograph to Solis, he saw Solis shredding some papers he had taken from his pocket and dropping them on the ground. The detective retrieved the shreds, which were pieces of a Texas Department of Criminal Justice Parole Division appointment card and business card.

The detective gave the shredded cards to the federal agents, went back to his car, and entered Solis's name into the computer. After 15 to 30 minutes, the computer revealed that Solis was on parole in Texas for drug violations, and the detective placed him in custody while the federal agents contacted the Texas authorities. The agents eventually received confirmation from the Texas Department of Corrections that a parole warrant was out for Solis.

Solis argues that he was detained without probable cause, based on an unverified uncorroborated anonymous tip, and that any subsequent searches were invalid. We disagree. Even if there is no probable cause to arrest someone for a traffic or other offense, the Fourth Amendment allows police to stop a vehicle to investigate a reasonable suspicion of criminal activity. *Vansant v. State*, 264 Ga. 319, 320 (2) (443 SE2d 474) (1994).

> Although an officer may conduct a brief investigative stop of a vehicle, such a stop must be justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968). The U. S. Supreme Court recognized the difficulty in defining "the elusive concept of what cause is sufficient to authorize police to stop a person," and concluded that the essence of the elusive concept was to take the totality of the circumstances into account and determine whether the detaining officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U. S. 411, 417-418 (101 SC 690, 66 LE2d 621) (1981). "This demand for specificity in the information upon which police action is predicated is the central teaching of (the Supreme Court's) Fourth Amendment jurisprudence." *Terry v. Ohio*, supra at 21, n. 18.

(Citations omitted.) Id.

Accordingly, a general suspicion or a mere hunch is not sufficient to support an investigative stop. While officers usually acquire reasonable suspicion through personal observation, information acquired from an informant who exhibits a sufficient indicia of reliability can also be the basis for reasonable suspicion. *Alabama v. White*, 496 U. S. 325, 328 (110 SC 2412, 110 LE2d 301) (1990).

> In *Alabama*[, supra], the Supreme Court found the anonymous tipster's ability to predict the future behavior of the defendant was the important factor in establishing the reliability of the tip about the defendant's illegal drug activity in that case "because it demonstrated inside information — a special familiarity with (defendant's) affairs." Id. at 332.

*Britton v. State*, 220 Ga. App. 120, 121 (469 SE2d 272) (1996).

In this case, the DEA agent testified that the anonymous tipster was the same person who had called six months earlier with a tip about Solis. Investigators had already corroborated many details of

that earlier tip. The tip in May 2003 was specific, naming defendant (although he was using another name), the route he would travel, the area of town he would be traveling in, the make and model of his car, and the state in which the car was registered. Further, after the agents recognized Solis and began following him, Solis started driving erratically, speeding, and changing lanes without signaling in an apparent attempt to evade his followers. It is important that

> the anonymous tip contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. . . . What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information — a special familiarity with [Solis's] affairs. . . . Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

(Citations and punctuation omitted.) *White*, supra, 496 U. S. at 332.

Once the officers made the investigatory stop, they properly detained Solis until they could ascertain the status of his driver's license. *Sutton v. State*, 223 Ga. App. 721, 723 (1) (478 SE2d 910) (1996). After the license check revealed that Solis was on parole in Texas, the officer properly detained him further until they contacted his parole officer, who then had a parole warrant issued. See *Williams v. State*, 233 Ga. App. 70, 71 (1) (503 SE2d 324) (1998). Based on these facts, we conclude that the trial court did not err in denying Solis's motion to suppress evidence made on the ground that his initial stop and continued detention violated the Fourth Amendment.

(b) After the detectives received word about the parole warrant, they obtained a search warrant for the Stone Mountain residence. The search warrant affidavit outlined the facts as set out above, then provided,

> Based on the above information, i.e. the two anonymous tips of narcotics trafficking, the seizure of $150,000.00 from a concealed compartment in a vehicle, the consistency of Mr. Solis's activity, which is consistent with illegal narcotics activities, and the deception provided by Mr. Solis during his

conversation with Officer Becker, Affiant requests that a Search Warrant be issued for the residence of [specific address], Stone Mountain, Georgia, in Unincorporated DeKalb County, and the vehicle which is now parked in the garage at the location.

The search warrant described the house with particularity and specified that the search was for "marijuana, cocaine, U. S. currency, drug paraphernalia and documents related to the sale, manufacturing and/or distribution of illegal narcotics."

One of the keys the DeKalb County detective found on Solis unlocked the door to the Stone Mountain house, and another key unlocked the Ford Focus in the garage. A drug dog alerted in an upstairs bedroom, and the officers found four kilograms of cocaine in the attic.

Solis argues that the search warrant was flawed because it was based on two anonymous unverified tips and on information obtained during his illegal detention. First, we have held that his detention was not illegal. Second, the State conceded at the motion hearing that some of that information, such as Solis's lying about having just come from the airport, was obtained during an interrogation improperly undertaken without giving Solis his *Miranda* warnings. Even excluding that information, however, "[t]he totality of the circumstances and evidence collected was sufficient to find that there was a fair probability that a search of [the property] would result in evidence relevant to a crime, and therefore probable cause existed for the issuance of the warrant." (Citations and punctuation omitted.) *Walsh v. State*, 236 Ga. App. 558, 559 (1) (a) (512 SE2d 408) (1999).

(c) While executing the search warrant on the house in Stone Mountain, a drug dog alerted on the front of the Focus located in the garage, and the detective could see through the windows that the dashboard was disassembled with pieces on the front seat and floorboard. He testified that he suspected that the narcotics were being transported in a concealed compartment in the dash. A key found in Solis's pocket unlocked the vehicle. The detective impounded the car, and searched it the following day with a drug dog. The dog alerted on the outside of the car toward the rear, and the detective discovered a kilogram of cocaine in the trunk under the spare tire.

Solis argues that, while the detective's affidavit sought a warrant to search the car, it did not identify the car with sufficient particularity and the warrant itself did not specifically include the car. This argument is without merit. "A warrant which authorizes the search of a particular dwelling extends by implication to areas within the curtilage of the dwelling. Vehicles parked within the curtilage of a dwelling to be searched pursuant to a warrant may also be searched

pursuant to that warrant." (Citations and punctuation omitted.) *Midura v. State*, 183 Ga. App. 523, 525 (4) (359 SE2d 416) (1987).

2. Solis contends that the evidence at trial was insufficient to sustain his conviction. We view the evidence on appeal in the light most favorable to the verdict, and no longer presume the defendant is innocent. We do not weigh the evidence or decide the witnesses' credibility, but only determine if the evidence is sufficient to sustain the convictions. *Taylor v. State*, 226 Ga. App. 254, 255 (485 SE2d 830) (1997).

Viewed in that light, the evidence at trial as described earlier established the facts surrounding the events that led to Solis's arrest. The landlord's agent for the Stone Mountain house testified that he had known Solis for some time, and that Solis had contacted him about wanting to rent a house. The agent met Solis at the house, which they toured, and Solis said he was interested but wanted his wife to see it. The agent gave him a key and invited him to return with his wife to look around, and if she liked it, Solis could keep the key; if not, he could return it. Solis and the agent were the only people who had keys to the house. About ten days later, Solis called and said he wanted to rent the house. The agent agreed to meet him at the house with two copies of the lease agreement.

The two men met at the Stone Mountain house on May 1, 2003. Solis was inside the house when the agent drove up, and said he would get back to the agent after his wife looked over the leases. The agent then agreed to give Solis a ride to a rental car agency, and dropped him off there. Solis left both copies of the lease in the agent's truck. The agent stopped back by the house that afternoon to pick up some trash and saw a Ford Focus in the garage with Texas tags.

After Solis was arrested, the DeKalb County detectives executed the search warrant on the Stone Mountain house, using a door key they found in Solis's pocket. A drug dog accompanied them, and indicated that he found a substance he was trained to locate in an upstairs bedroom and at the front of the car in the garage. Because the room had no furniture, the detectives searched the attic above the bedroom, where, as discussed earlier, they found four kilograms of cocaine, wrapped in four separate packages.

Almost all of the dashboard in the Focus was disassembled and lying on the seat and floor, along with various tools. Solis had keys to the car in his pocket. The detectives impounded the car and, as discussed earlier, a search the next day uncovered a fifth kilogram of cocaine in the trunk beneath the spare tire. Fingerprints lifted from the driver's door matched Solis's prints, and several papers in the car had his name on them.

We conclude that the evidence as outlined above was sufficient for a rational trier of fact to find Solis guilty beyond a reasonable

doubt of cocaine trafficking. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

3. Solis asserts that the trial court erred in admitting evidence of the two pieced-together cards from the Texas Department of Criminal Justice, Parole Division. One was a business card for a parole officer, with appointment dates written in on the back, the first appointment being May 6, 2003, four days after Solis's arrest. The other was the business card of a parole supervisor also named Solis. The DeKalb county detective who questioned Solis after the federal agents' initial questioning testified that he picked up the pieces of the cards after Solis tore them up and threw them down before he was arrested. Solis argues that the admission of testimony and of the cards themselves improperly placed his character into issue, because the jury could tell from looking at them that he was on parole when he was arrested.

Evidence of the circumstances surrounding an arrest is subject to the same standards of relevancy and materiality that govern the admission of all other evidence, and the decision whether to admit evidence connected to an arrest lies within the discretion of the trial court. *Benford v. State,* 272 Ga. 348, 350 (3) (528 SE2d 795) (2000). Further, "all of the circumstances surrounding an arrest are admissible for whatever value the jury wants to place on them." (Citation omitted.) *Brumelow v. State,* 239 Ga. App. 119, 123 (5) (520 SE2d 776) (1999). Material evidence is not made inadmissible merely because it inadvertently places a defendant's character in issue. *Greer v. State,* 199 Ga. App. 106, 107 (1) (403 SE2d 825) (1991). The trial court did not abuse its discretion in allowing this evidence to be admitted.

4. Solis asserts that the trial court erred in giving the State's request to charge about leased property, because no evidence showed Solis ever signed a lease for the house in Stone Mountain. The charge read as follows:

> If you find that a person owns or is the lessee of a house or premises, you will be permitted, but not required, to infer that such person is in possession of the entire premises and all of the property located on or in the premises. However, this is a rebuttable inference and may be overcome by evidence that others had access to the premises. Whether or not this inference is drawn from proof that a person is the owner or the lessee of a house or premises and whether or not the inference has been overcome by proof that others had access to the premises are questions for the jury alone.

While the State did not present evidence that Solis had signed a lease, there was sufficient evidence from which the jury could conclude he had a possessory interest of some sort in the property. He told the

landlord's agent that he wanted to show the lease to his wife, he was the only person besides the agent with a key to the house, and his car was parked in the garage. Because there was evidence that Solis had a possessory interest of some sort in the house, we find no error in the trial court's giving the challenged jury charge. *McGinnis v. State*, 208 Ga. App. 354, 355-356 (3) (430 SE2d 618) (1993).

5. Solis contends that the verdict form submitted to the jury improperly listed the option to find him guilty before the option to find him not guilty. This issue has been decided adversely to Solis in *Rucker v. State*, 270 Ga. 431, 435 (5) (510 SE2d 816) (1999). The court in *Rucker* concluded that the

> use of a jury verdict form preprinted with the words "Guilty" and "Not Guilty" does not constitute error unless the form would mislead jurors of reasonable understanding. . . . In and of itself, merely listing the possible guilty verdict option(s) before the "Not Guilty" option does not render the verdict form misleading so as to constitute reversible error. Measuring the verdict form used in the case at bar against this standard, we find no merit to appellant's assertion of reversible error in the use of the preprinted verdict form.

(Citation omitted.) Id.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED JULY 2, 2004 —
RECONSIDERATION DENIED JULY 15, 2004 — 

*Timothy T. Herring*, for appellant.

*Jeffrey H. Brickman, District Attorney, Barbara B. Conroy, Assistant District Attorney*, for appellee.